No. 98-066

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 261

296 Mont. 361

989 P.2d 364

JAMES H. ARMSTRONG, M.D.; SUSAN

CAHILL, P.A.; BARBARA POLSTEIN, D.O.;

MINDY OPPER, P.A.; and BLUE MOUNTAIN

CLINIC, on behalf of themselves and their patients

throughout Montana, the surrounding states and

Canada,

Plaintiffs and Respondents,

v.

THE STATE OF MONTANA and JOSEPH P.

MAZUREK, in his official capacity as Attorney

General for the State of Montana and his agents

and successors,

Defendants and Appellants.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Jeffrey M. Sherlock, Judge presiding.

COUNSEL OF RECORD:

**For Appellant:**

Joseph P. Mazurek, Attorney General, Clay R. Smith, Solicitor (argued), Helena, Montana

**For Respondent:**

Janet Benshoof, Simon Heller (argued), Julie F. Kay, The Center for Reproductive Law & Policy, New York, New York; Bruce Measure, Law Offices of Ambrose Measure, Kalispell, Montana

Heard: October 15, 1998

Submitted: July 1, 1999

Decided: October 26, 1999

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

**¶1.Plaintiffs James H. Armstrong, M.D.; Susan Cahill, P.A.; Barbara Polstein, D.O.; Mindy Opper, P.A.; and Blue Mountain Clinic, filed suit in this matter seeking a determination that § 37-20-103, MCA (1995), and § 50-20-109, MCA (1995), prohibiting physician assistants-certified from performing abortions, violates the privacy, equal protection and bill of attainder provisions of the Montana Constitution. The District Court for the First Judicial District, Lewis and Clark County, granted Plaintiffs' motion for a preliminary injunction, protecting the abortion practice of Armstrong and Cahill. The State appeals. We affirm.**

## Introduction

### *Standing*

¶2.The core constitutional right which is under attack in the case at bar is the fundamental right of individual privacy guaranteed by Article II, Section 10, of the Montana Constitution. Quite simply, the statutory amendments at issue prevent a woman from obtaining a lawful medical procedure--a pre-viability abortion--from a health care provider[1] of her choosing. In so doing, these amendments unconstitutionally infringe a woman's right to individual privacy under Montana's Constitution.

¶3.Before we begin our substantive discussion setting forth our rationale for this conclusion, we must first note the obvious. Plaintiffs Armstrong, Cahill, Polstein and Opper are not women who were prevented from obtaining a pre-viability abortion. Rather, they are health care providers who perform such abortion services, or who provide counseling and referrals related to such services. Plaintiff Blue Mountain Clinic, an institutional health care provider, employs Polstein and Opper. In all instances, the plaintiffs brought suit on their own behalf as well as on behalf of their patients. Thus, we are faced with a threshold question: Do the plaintiff health care providers have standing to assert the privacy rights of their women patients? We conclude that they do.

¶4.Standing was not raised by the parties. Rather, this case was briefed and argued to the District Court and to this Court on appeal on the basis that the statutory amendments either did or did not violate women's constitutional right to privacy. Presented in that posture, we would, as a general rule, decline to address on appeal an issue not raised by the parties. *See Custody of N.G.H.* (1998), 1998 MT 212, ¶ 19, 290 Mont. 426, ¶ 19, 963 P.2d 1275, ¶ 19. Standing, however, is an exception to that rule. *See Matter of Paternity of Vainio* (1997), 284 Mont. 229, 235, 943 P.2d 1282, 1286 (identifying standing as a "threshold requirement of every case"); *Rieman v. Anderson* (1997), 282 Mont. 139, 144, 935 P.2d 1122, 1125 (stating that objections to standing cannot be waived and may be raised by the court *sua sponte*).

¶5.Moreover, since this case involves important issues of first impression in Montana, our failure to raise and to address standing may leave open to further challenge via that argument the constitutional rights at issue. We are not willing to leave that stone unturned, and, therefore, choose to articulate the rationale which makes it appropriate that we decide this case on the basis that it was presented to us.

¶6.In the context of challenges to government action, we have stated that the

following criteria must be satisfied to establish standing: (1) The complaining party must clearly allege past, present or threatened injury to a property or civil right; and (2) the alleged injury must be distinguishable from the injury to the public generally, but the injury need not be exclusive to the complaining party. *See Olson v. Department of Revenue* (1986), 223 Mont. 464, 470, 726 P.2d 1162, 1166 (concluding that the appellants lacked standing to challenge the constitutionality of statutes requiring county residency to run for county office, or obtain a hunting or fishing license, where the record reflected that they had not attempted to run for office or obtain hunting or fishing licenses); *Lee v. State* (1981), 195 Mont. 1, 7, 635 P.2d 1282, 1285 (concluding that the appellant, as a licensed Montana motorist, was directly affected by 55-mile-an-hour speed limit law, and therefore had standing to challenge its constitutionality although the law generally applied to all motorists).

¶7. Although we followed *Lee* in *Helena Parents v. Lewis & Clark County* (1996), 277 Mont. 367, 922 P.2d 1140, we also extensively relied on numerous United States Supreme Court decisions in articulating whether a parents' organization had standing to challenge a county and school district's investment practices that allegedly violated state law. In concluding that the organization had standing, we effectively broadened the second prong of the above two-part rule to include harm that is common to the general public but that can still affect the individual taxpayer in ways that are not common to the public. *See Helena Parents*, 277 Mont. at 371-74, 922 P.2d at 1142-44 (citing *Worth v. Saltine* (1975), 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343; *Flast v. Cohen* (1968), 392 U.S. 83, 99-100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947; *Virginia v. American Booksellers Ass'n.* (1988), 484 U.S. 383, 392-93, 108 S.Ct. 636, 642-43, 98 L.Ed.2d 782; *United States v. SCRAP* (1973), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254; *Sierra Club v. Morton* (1972), 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636).

¶8. The case at bar--involving constitutional issues related to abortion and privacy--presents a standing question of first impression in Montana. It is one which does not fit precisely within the parameters of the broadened two-part rule set out above. Specifically, the standing question can be phrased as: Where governmental regulation directed at health care providers impacts the constitutional rights of women patients, may a health care provider litigate the infringement of these rights on behalf of the women or must the women aggrieved assert their own rights?

¶9. Finding no relevant authority in Montana on this question we again turn, as we

did in *Helena Parents*, to federal case law. The federal courts have thoroughly addressed and resolved whether the special relationship between a physician and patient afford the former standing to litigate the constitutional rights of the latter. *See Singleton v. Wulff* (1976), 428 U.S. 106, 117-18, 96 S.Ct. 2868, 2875-76, 49 L.Ed.2d 826 (concluding that based on the "closeness of the relationship," physicians have standing to maintain, on behalf of their women patients, a suit challenging the constitutionality of certain Missouri abortion laws). *See also Cruzan v. Director, Missouri Dep't of Health* (1990), 497 U.S. 261, 340 n.12, 110 S.Ct. 2841, 2884 n.12, 111 L.Ed.2d 224 n.12 (Stevens, J., dissenting) (stating that the United States Supreme Court has "recognized that the special relationship between patient and physician will often be encompassed within the domain of private life protected by the Due Process Clause," and citing *Griswold v. Connecticut* (1965), 381 U.S. 479, 481, 85 S.Ct. 1678, 1679, 14 L.Ed.2d 510, and *Roe v. Wade* (1973), 410 U.S. 113, 152-53, 93 S.Ct. 705, 726-27, 35 L.Ed.2d 147). *See also Planned Parenthood of Central Missouri v. Danforth* (1976), 428 U.S. 52, 59, 96 S.Ct. 2831, 2836, 49 L.Ed. 788 (noting that once the lower court deemed physicians had standing to bring suit on behalf of patients, it was "unnecessary to determine whether Planned Parenthood also had standing").

¶10.It is especially noteworthy that the federal courts have not refrained from according to physicians, threatened with the personal risk of prosecution, standing to challenge abortion restrictions by asserting the rights of their patients. The holding and analysis in *Singleton* unequivocally established that right three years after the Court decided *Roe v. Wade*. Citing prior case law where physicians had been allowed to assert the rights of their patients, the *Singleton* Court stated:

> A woman cannot safely secure an abortion without the aid of a physician, and an impecunious woman cannot easily secure an abortion without the physician's being paid by the State. The woman's exercise of her right to an abortion, whatever its dimension, is therefore necessarily at stake here. Moreover, the constitutionally protected abortion decision is one in which the physician is intimately involved. See Roe v. Wade, 410 U.S. 153-156, 93 S.Ct. 726-728. Aside from the woman herself, therefore, the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, that decision.

> . . . .

For these reasons, we conclude that it generally is appropriate to allow a physician

to assert the rights of women patients as against governmental interference with the abortion decision . . . .

*Singleton*, 428 U.S. at 117-18, 96 S.Ct. at 2875-76.

¶11. Even the concurring-dissenting justices in Singleton (who disagreed with part of the Supreme Court's decision on the facts of the case) nevertheless conceded the correctness of the Court's analysis and holding in situations where the "State directly interdicted the normal functioning of the physician-patient relationship by criminalizing certain procedures." *Singleton*, 428 U.S. at 128, 96 S.Ct. at 2881 (Powell, J., concurring and dissenting).

¶12. That is, of course, precisely the situation in the case *sub judice*. The statutes challenged by the health care providers here directly interdict the normal functioning of the physician-patient relationship by criminalizing certain procedures.

¶13. Accordingly, on the basis of the foregoing and in the context of this case, we resolve the standing issue by adopting the approach of the federal courts. We hold that the Plaintiff health care providers have standing to assert on behalf of their women patients the individual privacy rights under Montana's Constitution of such women to obtain a pre-viability abortion from a health care provider of their choosing.

## Scope of Opinion

¶14. Having thus resolved the standing issue, we also conclude that in the context of this case, Article II, Section 10 of the Montana Constitution broadly guarantees each individual the right to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from government interference. More narrowly, we conclude that Article II, Section 10, protects a woman's right of procreative autonomy--i.e., here, the right to seek and to obtain a specific lawful medical procedure, a pre-viability abortion, from a health care provider of her choice.

¶15. Importantly, this case requires that we decide who should set the standards for reasonable medical practice and procedure in this State. As in the case at bar, should legislators determine these standards based upon prevailing political ideology,

personal values and beliefs, and under pressure from a vocal and powerful constituency? Or, should these standards be set by the medical community in the exercise of its collective professional expertise and judgment, acting through the state's medical examining and licensing authorities, and after taking into consideration the education, training, experience and skills of the health care provider and the patient's health interests?[2]

¶16.Finally, we must decide whether, in the case before us, the government has demonstrated a compelling state interest for infringing women's right of procreative autonomy guaranteed under Article II, Section 10 of the Montana Constitution. In this regard, we conclude that it has not.

## Factual and Procedural Background

¶17.To place the challenged legislation in proper perspective, we review the history and evolution of the related statutory provisions. In response to the United States Supreme Court's decision in *Roe v. Wade*, the Montana Legislature enacted the Montana Abortion Control Act (the Act), Title 50, Chapter 20 of the Montana Code Annotated. Included in that legislation were the following provisions:

**Control of practice of abortion.** (1) No abortion may be performed within the state of Montana:

(a) except by a licensed physician;

(b) after the first 3 months of pregnancy, except in a hospital licensed by the department;

. . .

(4) No physician, facility, or other person or agency shall engage in solicitation, advertising, or other form of communication having the purpose of inviting, inducing, or attracting any person to come to such physician, facility, or other person or agency to have an abortion or to purchase abortifacients.

Section 50-20-109, MCA (1991).

¶18.In December 1992, Arlette Randash (Randash), Executive Director of the Montana Right to Life Association, and Charles Lorentzen (Lorentzen), President of Flathead Pro-Life, began writing letters to various individuals in state and local government arguing that criminal charges should be brought against Dr. Armstrong and P.A. Cahill. In a December 7, 1992 letter to then Attorney General Marc Racicot, Randash asked Racicot to investigate the performance of abortions by a physician assistant working at Dr. Armstrong's office and for Racicot to inform Randash of his findings. Randash alleged that the abortions were being performed in violation of § 50-20-109, MCA.

¶19.In March 1993, Lorentzen sent similar letters regarding Dr. Armstrong to Racicot, who by then was Governor of Montana, to Flathead County Attorney Tom Esch, and to Eleanor Parker, Montana Department of Health and Environmental Sciences counsel. Lorentzen alleged that Dr. Armstrong had violated the Act, specifically §§ 50-20-109(1)(a), (b) and (4), MCA. Parker referred the letter to Attorney General Joe Mazurek who referred the matter to Esch. On April 9, 1993, Esch asked Detective Ron Fredenberg of the Kalispell Police Department to investigate the performance of abortions at Dr. Armstrong's office by a person other than a licensed physician and the performance of second-trimester abortions outside of a hospital.

¶20.Dr. Armstrong and P.A. Cahill, the only physician assistant in the State performing abortions, challenged various provisions of the Act in federal court. Subsequently, the State stipulated to a permanent injunction prohibiting enforcement of Montana's requirement that abortions be performed only by licensed physicians as well as a permanent injunction against the second-trimester hospitalization requirement and the ban on advertising.

¶21.In 1995, Representative Susan Smith (Smith) of Kalispell, sponsored House Bill 442 to amend § 37-20-103, MCA (a portion of the Montana Code regulating physician assistants-certified), and § 50-20-109, MCA, to specifically exclude physician assistants-certified from performing abortions. Ch. 321, L. 1995. Thus, as noted by District Judge Sherlock, these amendments trace their genesis to the complaints and demands addressed to county and state officials by certain anti-abortion groups operating in the Flathead Valley of northwestern Montana.

¶22.Smith contended in hearings before the House Committee on Human Services

and Aging, and the Senate Committee on Public Health, Welfare & Safety, that HB 442 was intended to protect women who are seeking abortions from possible complications and that the legislation was a women's health and safety issue. However, at the hearings, Smith and other proponents of the legislation failed to relate any complications or problems encountered by patients of P.A. Cahill during the more than twenty years that P.A. Cahill has been performing abortions.

¶23.Furthermore, those testifying in support of HB 442 during the February 10, 1995 hearing before the House Committee on Human Services and Aging, and the March 10, 1995 hearing before the Senate Committee on Public Health, Welfare and Safety, failed to give any medical justification for excluding physician assistants-certified from performing abortions. Moreover, none of the proponents of HB 442 testifying before the House Committee and only one of the proponents of HB 442 testifying before the Senate Committee was a licensed physician. Instead, those testifying in favor of HB 442 included representatives of the Montana Right to Life Association, the Montana Catholic Conference, and Eagle Forum, as well as the Executive Director of the Montana Christian Coalition.

¶24.Opponents of HB 442 testified that, since there were no medical reasons why physician assistants-certified could not perform abortions, HB 442 was just another obstacle to affordable health care for women. Those testifying against HB 442 included both current and former members of the Montana Board of Medical Examiners, the Executive Director of the American Civil Liberties Union of Montana, and the President of the Montana Academy of Physician Assistants, as well as representatives of the Montana Women's Lobby, the Montana Business and Professional Women's Association, the Center for Reproductive Law and Policy, and the National Abortion and Reproductive Rights Action League.

¶25.HB 442 was passed by the Montana Legislature and signed into law by Governor Racicot on April 3, 1995. Through the passage of this bill, § 37-20-103, MCA, was amended to include the following sentence: "A physician assistant-certified may not perform an abortion." And, § 50-20-109, MCA, was amended to include a new subsection (5) that provides: "The utilization plan of a physician assistant-certified may not provide for performing abortions." In addition, such conduct was criminalized as a felony. Section 50-20-109(6), MCA. Passage of HB 442 also effectively re-enacted the provisions requiring second trimester abortions to be performed in a hospital and banning advertising.

¶26.Dr. Armstrong and P.A. Cahill, along with various other abortion providers, responded to the amendment of § 37-20-103, MCA, and § 50-20-109, MCA, by filing suit in federal court to prevent enforcement of the amended statutes regarding physician assistants. They also sought to prevent the enforcement of the second trimester hospitalization requirement and the ban on advertising which were re-enacted by the amendment of the statute. The trial court enjoined enforcement of the re-enacted abortion restrictions, but declined to grant a preliminary injunction against enforcement of the ban on Dr. Armstrong's utilization of P.A. Cahill to perform abortions. *Armstrong v. Mazurek* (D. Mont. 1995), 906 F.Supp. 561.

¶27.On appeal, the Ninth Circuit vacated the District Court's denial of a preliminary injunction against enforcement of the statutes restricting the performance of abortions to licensed physicians and remanded the case to the District Court. *Armstrong v. Mazurek* (9th Cir. 1996), 94 F.3d 566. On November 5, 1996, the State consented to an injunction against enforcement of the Act while the State sought review by the United States Supreme Court. The Supreme Court, by a 6-3 vote, determined that Plaintiffs failed to establish the likelihood of prevailing on the merits of their claim that the statutory provisions violated due process by imposing an undue burden on a woman's right to choose to terminate a pregnancy prior to the viability of the fetus, and thus, Plaintiffs were not entitled to preliminary injunctive relief. *Mazurek v. Armstrong* (1997), 520 U.S. 968, 117 S.Ct. 1865, 138 L.Ed.2d 162.

¶28.On October 1, 1997, following the Supreme Court's ruling, Respondents filed the instant case in the District Court for the First Judicial District, Lewis and Clark County, contending that HB 442 violated Montana's constitutional provisions regarding privacy, due process, and equal protection of the laws. On November 25, 1997, the District Court granted Plaintiffs' motion for a preliminary injunction, but limited the scope of the injunction to Dr. Armstrong and P.A. Cahill. The District Court found that the Act affects a woman's constitutional right to obtain a first trimester abortion and that the State had advanced no compelling interest to justify prohibiting P.A. Cahill from performing abortions as she has safely done for the past twenty years. The State appeals the court's order granting Plaintiffs' motion for a preliminary injunction.

Discussion

I.

¶29. Article II, Section 10 of the Montana Constitution provides:

> **Right of privacy.** The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

¶30. **Modern legal notions of the right of privacy trace their roots to the political theory of English philosopher John Locke. Locke's concept of "liberty" was prevalent in colonial America and significantly influenced the framers of this country's foundation documents, including the United States Constitution. Among other things, this philosophy holds that the laws of nature require that each individual has an inherent property interest in his own person and has the capacity for and the right of rational self-determination which must be promoted and protected by civil society and political institutions.** *See* **Larry M. Elison and Dennis NettikSimmons,** *Right of Privacy*, **48 Mont. L. Rev. 1, 17-19 (1987) (hereafter, Elison); Jeffrey S. Koehlinger,** *Substantive Due Process Analysis and the Lockean Liberal Tradition: Rethinking the Modern Privacy Cases*, **65 Ind. L.J. 723 (1990).**

¶31. **John Stuart Mill recognized this fundamental right of self-determination and personal autonomy as both a limitation on the power of the government and as principle of preeminent deference to the individual. He stated:**

> [T]he only purpose for which power can be rightfully exercised over any member of a civilised [sic] community, against his will, is to prevent harm to others. His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because, it will be better for him to do so, because it will make him happier, because, in the opinion of others, to do so would be wise, or even right.

Mill, *On Liberty*, 43 Great Books of the Western World 271 (R. Hutchins ed. 1952) (quoted in *Brophy v. New England Sinai Hospital* (1986), 398 Mass. 417, 430, 497 N.E.2d 626, 633).

¶32. **Despite prior judicial recognition of this general "liberty interest" or right of privacy by both the United States Supreme Court and this Court[3], the delegates to Montana's 1972 Constitutional Convention viewed the textual inclusion of this right in Montana's new constitution as being necessary for the protection of the individual**

in "an increasingly complex society . . . [in which] our area of privacy has decreased, decreased, decreased." This "right to be let alone . . . the most important right of them all," as Delegate Campbell put it, "produces . . . a semipermeable wall of separation between individual and state" in much the same fashion that a constitutional wall[4] separates church and state. Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1681.

¶33.Furthermore, it is clear from their debates that the delegates intended this right of privacy to be expansive--that it should encompass more than traditional search and seizure. The right of privacy should also address information gathering and protect citizens from illegal private action and from legislation and governmental practices that interfere with the autonomy of each individual to make decisions in matters generally considered private. Elison, at 11-13.

¶34.With this background, and as correctly noted by Judge Sherlock, Montana adheres to one of the most stringent protections of its citizens' right to privacy in the United States--exceeding even that provided by the federal constitution. *State v. Burns* (1992), 253 Mont. 37, 40, 830 P.2d 1318, 1320 (citing *Montana Human Rights Division v. City of Billings* (1982), 199 Mont. 434, 439, 649 P.2d 1283, 1286). Indeed, since the right of privacy is explicit in the Declaration of Rights of Montana's Constitution, it is a fundamental right. *Gryczan v. State* (1997), 283 Mont. 433, 449, 942 P.2d 112, 122. It is,

> perhaps, one of the most important rights guaranteed to the citizens of this State, and its separate textual protection in our Constitution reflects Montanans' historical abhorrence and distrust of excessive governmental interference in their personal lives.
>
> *Gryczan*, 283 Mont. at 455, 942 P.2d at 125. For this reason, legislation infringing the exercise of the right of privacy must be reviewed under a strict-scrutiny analysis--i.e., the legislation must be justified by a compelling state interest and must be narrowly tailored to effectuate only that compelling interest. *Gryczan*, 283 Mont. 449, 942 P.2d at 122 (citing *State v. Siegal* (1997), 281 Mont. 250, 263, 934 P.2d 176, 184, overruled in part by *State v. Kuneff* (1998), 291 Mont. 474, 970 P.2d 556).

II.

¶35.As noted, Article II, Section 10 of the Montana Constitution was intended by the delegates to protect citizens from illegal private action and from legislation and governmental practices that interfere with the autonomy of each individual to make decisions in matters generally considered private. However, it was not until our decision in *Gryczan* that this Court directly addressed and judicially recognized this "personal autonomy" component of Montanans' fundamental constitutional right of individual privacy. *Gryczan*, 283 Mont at 450-51, 942 P.2d at 123. *See also* Elison, at 13 n.83; Scott A. Fisk, *The Last Best Place to Die: Physician-Assisted Suicide and Montana's Constitutional Right to Personal Autonomy Privacy*, 59 Mont. L. Rev. 301, 323-25 (1998) (hereafter, Fisk). In *Gryczan*, we held that the personal autonomy component of the right of individual privacy includes the right of consenting adults to engage in private, same-gender, non-commercial sexual conduct free from governmental interference, intrusion and condemnation. *Gryczan*, 283 Mont. at 455-56, 942 P.2d at 126. Beyond that, however, we made no attempt to define personal autonomy as a component of the right of individual privacy or to articulate its scope.

¶36.While some suggest that this was an oversight--*see* Fisk, at 326--neither did the delegates to Montana's Constitutional Convention attempt to circumscribe the right to privacy. Rather the Bill of Rights Committee proposed "a broad provision . . . to permit flexibility to the courts in resolving the tensions between public interest and privacy." Montana Constitutional Convention, Committee Proposals, February 22, 1972, pp. 632-33. As Delegate Campbell noted:

> We had much discussion before [the Bill of Rights Committee], and why not try to define the right, to put in specific examples. But it was our feeling that once you do that, you are running a risk that you may eliminate other areas in the future which may be developed by the court.
>
> Montana Constitutional Convention, Verbatim Transcript, March 9, 1972, p. 1851. In truth, that the Convention delegates deliberately drafted a broad and undefined right of "individual"[5] privacy was more a testament to and culmination of Montanans' continuous and zealous protection of a core sphere of personal autonomy and dignity than it was an attempt to create a greater right than that which already existed by historical precedent. *See* William C. Rava, *Toward a Historical Understanding of Montana's Privacy Provisions*, 61 Alb. L. Rev. 1681, 1716-17 (1998).

¶37.Yet, defining personal autonomy has and continues to challenge courts, philosophers and authors. For example, the United States Supreme Court has stated that the right involves "intimate and personal choices" that concern "the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life," *Planned Parenthood v. Casey* (1992), 505 U.S. 833, 851, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674. It may also be that, as Fisk suggests, personal autonomy encompasses

> [t]he complex human capacities that . . . include language, self-consciousness, memory, logical relations, empirical reasoning about beliefs and their validity (human intelligence), and the capacity to use normative principles . . . [and] . . . rational choice, to decide which among several ends may be most effectively and coherently realized.

> Fisk, at 327 (quoting David A. J. Richards, *Sex, Drugs, Death and the Law* 8 (1982)). Or, more simply, as John Stuart Mill stated: "Over himself, over his own body and mind, the individual is sovereign." Mill, *On Liberty* (quoted in *Thor v. Superior Court* (Cal. 1993), 855 P.2d 375, 380).

¶38.Attempts to define this right notwithstanding, we conclude that, while it may not be absolute, no final boundaries can be drawn around the personal autonomy component of the right of individual privacy. It is, at one and the same time, as narrow as is necessary to protect against a specific unlawful infringement of individual dignity and personal autonomy by the government--as in *Gryczan*--and as broad as are the State's ever innovative attempts to dictate in matters of conscience, to define individual values, and to condemn those found to be socially repugnant or politically unpopular.

III.

¶39.And that brings us to the matter at bar: broadly, the right of each individual to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from the interference of the government; and, more narrowly, a woman's right to seek and obtain pre-viability abortion services. The former is protected under the personal autonomy component of the fundamental right of individual privacy set out in Article II, Section 10 of the Montana Constitution. The latter--procreative autonomy--is a protected form of

personal autonomy. Since the primary focus of this case is the latter, we begin with that.

¶40.There is no doubt that a woman's right to choose to have an abortion before fetal viability and to obtain it without "undue interference" or "undue burden" from the state is protected under the federal constitution. *Planned Parenthood*, 505 U.S. at 846, 112 S.Ct. at 2804. This federal constitutional right is grounded in privacy and is protected under the Due Process Clause of the Fourteenth Amendment. *Roe,* 410 U.S. at 153, 93 S.Ct. at 727; *Planned Parenthood*, 505 U.S. at 846, 112 S.Ct. at 2804.

¶41.Notwithstanding, and independently of the federal constitution, where the right of individual privacy is implicated, Montana's Constitution affords significantly broader protection than does the federal constitution. *Gryczan*, 283 Mont. at 448, 942 P.2d at 121 (citation omitted). Article II, Section 10, requires more than that the State simply not impose an undue burden on a person's exercise of his or her right of individual privacy. Rather, under Montana's Constitution, the government must demonstrate a "compelling state interest" for infringing this right.[6] *Gryczan*, 283 Mont. at 449, 942 P.2d at 122 (citation omitted).

¶42.Judge Sherlock determined that "if the right to privacy includes anything, it includes the decision of a woman whether or not to beget or bear a child . . . [and it] encompasses a woman's choice of whether or not to end her pregnancy." The court was correct in this statement of the law as derived from federal authorities. *See Eisenstadt v. Baird* (1972), 405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349; *Roe,* 410 U.S. at 153, 93 S.Ct. at 727. Facially, then, procreative autonomy being grounded in the right of privacy, there is no reason why this right would not also be encompassed within the broader personal autonomy protections afforded by the fundamental right of individual privacy guaranteed by Article II, Section 10 of the Montana Constitution.

¶43.The State in this case disagrees, however. Rather, it contends that Montana's Constitution does not protect women's right to obtain a pre-viability abortion and that this right is subject to legislative determination and regulation within the parameters of the weaker protections afforded by the federal constitution and federal law. The State argues that Article II, Section 10, excepts a woman's choice to obtain a pre-viability abortion because of the Constitutional Convention's rejection of Delegate Kelleher's attempt to confer constitutionally protected status on a fetus at

the time of conception. The government is wrong.

¶44.Significantly, the Convention determined *not* to deal with abortion in the Bill [Declaration] of Rights "at this time" and rather chose to leave the matter to the legislature because of the historical debate as to "when a person becomes a person." *See* comments of Delegate Dahood, Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1640. *Roe*, handed down a year after the Convention, resolved this debate from the legal standpoint, concluding that a fetus does not enjoy a constitutionally protected status--i.e., that a fetus is not a constitutional person-- until "viability" (at about 26 weeks or the third trimester). *See Roe*, 410 U.S. at 160, 162-65, 93 S.Ct. at 730-33; Ronald Dworkin, *Freedom's Law: The Moral Reading of the American Constitution* 87-90 (1996) (hereafter, Dworkin, *Freedom*).

¶45.Importantly, there is nothing in the Constitutional Convention debates which would logically lead to the conclusion that Article II, Section 10, does not protect, generally, the autonomy of the individual to make personal medical decisions and to seek medical care in partnership with a chosen health care provider free of government interference. Nor is there any reason to conclude, in light of *Roe* and post-*Roe* cases, that a woman's right to obtain a pre-viability abortion--part and parcel of her right of personal/procreative autonomy--likewise would not be encompassed within the protection of Montana's constitutional right of individual privacy. In fact, given the delegates' overriding concern that government not be allowed to interfere in matters generally considered private, and given the delegates' specific determination to adopt a broad and undefined right of individual privacy grounded in Montana's historical tradition of protecting personal autonomy and dignity, the opposite conclusion must be reached.

¶46.This determination is further supported by the Bill of Rights Committee's favorable reference to *Griswold v. Connecticut,* underlying its determination that the judicially-recognized right of privacy be elevated to explicit constitutional status. *See* Montana Constitutional Convention, Committee Proposals, February 22, 1972, p. 632. *Griswold* acknowledged the privacy interest inherent in contraception and procreation. *Griswold*, 381 U.S. at 485-86, 85 S.Ct. at 1162. Moreover, *Griswold* has been recognized to protect both "the individual interest in avoiding [accumulation and] disclosure of personal matters, and . . . the interest in independence in making certain kinds of important [personal] decisions," *Whalen v. Roe* (1977), 429 U.S. 589, 599-600, 97 S.Ct. 869, 876, 51 L.Ed.2d 64, including those "relating to marriage,

procreation, contraception, family relationships, and child rearing and education," *Paul v. Davis* (1976), 424 U.S. 693, 713, 96 S.Ct. 1155, 1166, 47 L.Ed.2d 405. *See* Elison, at 7.

**¶47. Similarly, in the floor debates, Delegate Campbell, emphasizing Montana's historical commitment to the right of privacy and arguing for the core "right to be let alone," cited *Griswold*.[7] These references to *Griswold* in the proceedings of the Constitutional Convention are important because**

> *Griswold* and [] other [federal] privacy decisions can be justified only on the presumption that decisions affecting marriage and childbirth are so intimate and personal that people must in principle be allowed to make these decisions for themselves, consulting their own preferences and convictions, rather than having society impose its collective decision on them.
>
> Ronald Dworkin, *Life's Dominion: An Argument About Abortion, Euthanasia, And Individual Freedom* 106 (First Vintage Books ed. 1994) (hereafter, Dworkin, *Life's Dominion*). Moreover,
>
> [t]he Supreme Court, in denying the state the specific power to make contraception criminal, presupposed the more general principle of procreative autonomy. . . . The law's integrity demands that the principles necessary to support an authoritative set of judicial decisions must be accepted in other contexts as well. It might seem an appealing political compromise to apply the principle of procreative autonomy to contraception, which almost no one now thinks states can forbid, but not to abortion, which powerful constituencies violently oppose. But the point of integrity--the point of the law itself--is exactly to rule out political compromises of that kind.

Dworkin, *Life's Dominion,* at 158.

**¶48. Accordingly, given Montana's broad, yet undefined, concept of individual privacy--historically predating even the 1972 Constitution; given the Constitutional Convention's unmistakable intent to textualize this tradition by explicitly protecting citizens from legislation and governmental practices that interfere with the autonomy of each individual to make decisions in matters generally considered private; given the Convention's reliance on *Griswold*; and given jurisprudential recognition, following the close of the Constitutional Convention, of a woman's right to seek and**

obtain a pre-viability abortion, it is clear that the procreative autonomy component of personal autonomy is protected by Montana's constitutional right of individual privacy found at Article II, Section 10.

¶49.Implicit in this right of procreative autonomy is a woman's moral right and moral responsibility to decide, up to the point of fetal viability, what her pregnancy demands of her in the context of her individual values, her beliefs as to the sanctity of life, and her personal situation. Moreover, the State has no more compelling interest or constitutional justification for interfering with the exercise of this right if the woman chooses to terminate her pre-viability pregnancy than it would if she chose to carry the fetus to term. Recognition of this point is important--especially for those who reject abortion. For if the State has the power to infringe the right of procreative autonomy in favor of birth, then, necessarily, it also has the power to *require* abortion under some circumstances. If one accepts the former, then imposition of the latter is no more remote than a change in prevailing political ideology.

¶50.And, if the reader finds this farfetched or shocking, consider that in 1927 the United States Supreme Court ruled that eugenics by involuntary sterilization of the mentally retarded was constitutionally permissible. According to that Court, "[i]t is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind." *Buck v. Bell* (1927), 274 U.S. 200, 207, 47 S.Ct. 584, 585, 71 L.Ed. 1000. Or, consider the United States Congressional Office of Technology Assessment's 1988 discussion of "Social and Ethical Considerations" raised by the Human Genome Project:

> Human mating that proceeds without the use of genetic data about the risks of transmitting diseases will produce greater mortality and medical costs than if carriers of potentially deleterious genes are alerted to their status and encouraged to mate with noncarriers or to use artificial insemination or other reproductive strategies.
>
> *See* George J. Annas, *Standard of Care: The Law of American Bioethics* 156 (1993) (quoting U.S. Congress, Office of Technology Assessment, *Mapping Our Genes: Genome Projects, How Big, How Fast?* 84 (U.S. Govt. Print Office 1988)).

¶51.Unless fundamental constitutional rights--procreative autonomy being the

present example--are grounded in something more substantial than the prevailing political winds, Huxley's *Brave New World* or Orwell's *1984* will always be as close as the next election. Fortunately, as demonstrated above, the roots of Montana's constitutional right of procreative autonomy go much deeper and are firmly embedded in the right of individual privacy guaranteed under Article II, Section 10 of the Montana Constitution.

IV.

¶52.Similarly, in the broader context of one's right to choose or refuse medical treatment, we must likewise conclude that these sorts of decisions are protected under the personal autonomy component of the individual privacy guarantees of Montana's Constitution. And properly so.

¶53.Few matters more directly implicate personal autonomy and individual privacy than medical judgments affecting one's bodily integrity and health. Joel Feinberg, a philosophy professor at the University of Arizona, describes the interrelationship between privacy and personal or "bodily" autonomy as follows:

> After all, we speak of "bodily autonomy," and acknowledge its violation in cases of assault, battery, rape, and so on. But surely our total autonomy includes more than simply our bodily "territory," and even in respect to it, more is involved than simple immunity to uninvited contacts and invasions. Not only is my bodily autonomy violated by a surgical operation ("invasion") imposed on me against my will; it is also violated in some circumstances by the withholding of the physical treatment I request (when due allowance has been made for the personal autonomy of the parties of whom the request is made). For to say that I am sovereign over my bodily territory is to say that I, and I alone, decide (so long as I am capable of deciding) what goes on there. My authority is a discretionary competence, an authority to choose and make decisions.

3 Joel Feinberg, *Harm to Self* 53 (1986). *See also* Fisk, at 326-27.

¶54.Indeed, medical treatment decisions

are, to an extraordinary degree, intrinsically personal. It is the individual making the decision, and no one else, who lives with the pain and disease. It is the individual

making the decision, and no one else, who must undergo or forego the treatment. And it is the individual making the decision, and no one else, who, if he or she survives, must live with the results of that decision. One's health is a uniquely personal possession. The decision of how to treat that possession is of a no less personal nature.

. . . The decision can either produce or eliminate physical, psychological, and emotional ruin. It can destroy one's economic stability. It is, for some, the difference between a life of pain and a life of pleasure. It is, for others, the difference between life and death.

*Andrews v. Ballard* (D.C. S.D.Tex. 1980), 498 F. Supp. 1038, 1047 (holding that the decision to obtain or reject medical treatment is encompassed by the right of privacy and that, absent evidence showing that they were narrowly drawn to achieve a compelling state interest, Texas regulations requiring acupuncturists to be licensed physicians imposed a burden on and significantly interfered with the patient's decision to obtain acupuncture treatment and were, therefore, unconstitutional).[8]

**¶55. Recognition of these inherent rights to make medical judgments affecting one's bodily integrity and health and the right to choose and to refuse medical treatment are certainly not creatures of recent invention, however. Rather, like America's historical legal tradition acknowledging the fundamental common law right of self-determination, acceptance of the right to make personal medical decisions as inherent in personal autonomy is a long-standing and an integral part of this country's jurisprudence.**

**¶56. Over a century ago, the Supreme Court observed:**

No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union Pacific Railway Co. v. Botsford* (1891), 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734. Eighty-five years ago, Justice Cardozo noted that, "[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body." *Schloendorff v. Society of New York Hosp.* (1914), 105 N.

E. 92, 93, overruled in part by *Bing v. Thunig*, (N.Y. 1957), 143 N.E.2d 3. And, more recently, the Supreme Court has reaffirmed that the right to control fundamental medical decisions is an aspect of the right of self-determination and personal autonomy that is "deeply rooted in this Nation's history and tradition." *Moore v. City of East Cleveland* (1977), 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531. *See also Matter of Quinlan* (1976), 355 A.2d 647.

**¶57.In the context of "informed consent" cases, Montana, too, has recognized that each individual is the sovereign of his or her own body. *Collins v. Itoh* (1972), 160 Mont. 461, 467, 503 P.2d 36, 40 ("Each man is considered master of his own body and may request or prohibit even lifesaving surgery. The law will not allow a physician to substitute his own judgment, no matter how well founded, for that of his patient.") (citing *Natanson v. Kline* (Kan. 1960), 350 P.2d 1093, 1104). *See also* Dworkin, *Freedom,* at 134 ("The law of most American states seems settled that the autonomy of a competent patient will be decisive . . . and that doctors may not treat him against his will either for his sake or for the sake of some social interest in keeping him alive").**

V.

**¶58.Acknowledging these precepts of patient autonomy, however, is not to deny the obvious--that medical decisions affecting one's bodily integrity and health must often and necessarily be made in partnership with a health care provider. In those instances, the individual typically seeks out and may consent to the most risky and intimate invasions of body and psyche, largely upon her or his personal trust in the education, training, experience, advice, and professional integrity of the health care provider he or she has chosen. This truism points up the seriousness of the infringement of personal autonomy and privacy that accompanies the government usurping, through laws or regulations which dictate how and by whom a specific medical procedure is to be performed, the patient's own informed health care decisions made in partnership with his or her chosen health care provider.**

**¶59.Certainly, this right of choice in making personal health care decisions and in exercising personal autonomy is not without limits. In narrowly defined instances the state, by clear and convincing evidence, may demonstrate a compelling interest in and obligation to legislate or regulate to preserve the safety, health and welfare of a particular class of patients or the general public from a medically-acknowledged,**

*bona fide* health risk. Subject to this narrow qualification, however, the legislature has neither a legitimate presence nor voice in the patient/health care provider relationship superior to the patient's right of personal autonomy which protects that relationship from infringement by the state.

¶60.Worse, when, as in the case at bar, the legislature thrusts itself into this protected zone of individual privacy under the guise of protecting the patient's health, but, in reality, does so because of prevailing political ideology and the unrelenting pressure from individuals and organizations promoting their own beliefs and values, then the state's infringement of personal autonomy is not only constitutionally impermissible, it is, as well, intellectually and morally indefensible.

¶61.Long ago, this Court declared that "the State Constitution is a limitation upon the power of the legislature and not a grant of power to that body." *State v. Aronson* (1957), 132 Mont. 120, 127, 314 P.2d 849, 852 (citing *State ex rel. Dufresne v. Leslie* (1935), 100 Mont. 449, 50 P.2d 959). Just as the government has no business in the bedrooms of consenting adults, *Gryczan*, 283 Mont at 450, 942 P.2d at 122, neither does it have any business in the treatment rooms of their health care providers, except under the very narrowly defined circumstances referred to above.

¶62.Simply put, except in the face of a medically-acknowledged, *bona fide* health risk, clearly and convincingly demonstrated, the legislature has no interest, much less a compelling one, to justify its interference with an individual's fundamental privacy right to obtain a particular lawful medical procedure from a health care provider that has been determined by the medical community to be competent to provide that service and who has been licensed to do so. To this end, it also logically and necessarily follows that legal standards for medical practice and procedure cannot be based on political ideology, but, rather, must be grounded in the methods and procedures of science and in the collective professional judgment, knowledge and experience of the medical community acting through the state's medical examining and licensing authorities.

## VI.

¶63.The case at bar, unfortunately, exemplifies the gross violation of these principles. Based upon P.A. Cahill's education, training and experience, the Board of Medical Examiners, in its professional judgment, determined that, under the supervision of a

licensed physician, she was competent to perform certain types of abortions and other even more risky medical procedures. In the District Court, the government failed utterly to demonstrate why this determination was wrong or that the State had a compelling interest for effectively infringing the right of procreative autonomy of women to obtain a pre-viability abortion and their right of personal autonomy to choose P.A. Cahill, under the supervision of Dr. Armstrong, to perform this lawful medical procedure.

¶64.Rather, the record shows that the legislature chose to prohibit P.A. Cahill from performing abortions, yet made no attempt to prohibit her from performing other more risky medical procedures such as uncomplicated deliveries of babies[9], inserting IUDs, and prescribing and administering most drugs. The record also shows that the legislature chose to prohibit P.A. Cahill from executing various procedures at the direction of the doctor performing a medical abortion, yet did not prohibit registered nurses or others with less training than P.A. Cahill from executing those same procedures. The record shows that P.A. Cahill has been performing abortions with the approval of the Montana Board of Medical Examiners since 1983; that she has performed approximately 3,000 abortions; that she has never been sued for malpractice or disciplined; and that Dr. Armstrong's rate of complications for patients obtaining abortions from him is the same as the rate for patients obtaining abortions from P.A. Cahill.[10] The record shows, and Judge Sherlock found, that "[t]here is simply no evidence to support the contention that this practice by Cahill and Armstrong in any way endangers women's health." In short, the record shows that "protecting women's health" served as little more than a rhetorical guise for enacting the 1995 amendments to § 37-20-103, MCA, and § 50-20-109, MCA, and that this legislation was not justified by any constitutionally legitimate interest of the State, compelling or otherwise.

¶65.Indeed, the history of the 1995 amendments to § 37-20-103, MCA, and § 50-20-109, MCA, and the record of this case demonstrate how unrelenting pressure from individuals and organizations promoting their own particular values influence politicians to legislate, often via the back door, in matters of personal conscience, belief and choice and, concomitantly, infringe the zone of personal autonomy and procreative autonomy protected by the right of individual privacy. The reality of this case is that, while the legislature could not make pre-viability abortions facially unlawful, it could, and did--under the facade of "protecting women's health" and the lesser "undue burden" test of *Planned Parenthood*--attempt to make it as difficult, as

inconvenient and as costly as possible for women to exercise their right to obtain, from the health care provider of their choice,[11] a specific medical procedure protected by the Due Process Clause of the federal constitution and, independently of the Fourteenth Amendment, protected by their greater right of individual privacy under Article II, Section 10 of the Montana Constitution. Furthermore, that the 1995 amendments to § 37-20-103, MCA, and § 50-20-109, MCA, may have been narrowly drawn is irrelevant, where, as here, there was no predicate compelling state interest justifying the amendments in the first place.

¶66. There is simply no evidence in the record of this case that laws requiring pre-viability abortions be performed only by a physician to the exclusion of a trained, experienced and medically competent physician assistant-certified, working under the supervision of a licensed physician, are necessary to protect the life, health or safety of women in this State. Indeed, there is overwhelming evidence to the contrary and that the 1995 amendments to § 37-20-103, MCA, and § 50-20-109, MCA, were the product of and grounded in nothing other than the divisive and vocal politics of abortion.

## VII.

### A.

¶67. That said, we close with two final observations. First, from our foregoing discussion, it should be apparent that this opinion is about the government's infringement of certain fundamental rights of individual privacy--personal and procreative autonomy--guaranteed under Article II, Section 10 of the Montana Constitution. From this same discussion, it should be equally obvious, what this opinion is *not* about. For the reasons hereafter set forth, the latter needs to be underscored, nonetheless. This opinion is not a comment, pro or con, on the merits of sectarian doctrine or on the deep and sincerely held personal beliefs, values and convictions of those who either favor abortion or who oppose it on moral or religious grounds.

¶68. Unfortunately, however, it is these doctrines, values, beliefs and convictions which invariably fuel the hurricane of *legal* debate on this issue. And that, of course, is precisely the problem. The government can demonstrate no compelling interest for legislating on the basis of any sectarian doctrine nor may the state infringe individual

liberty and personal autonomy because of majoritarian demands to safeguard some intrinsic value unrelated to the protection of the rights and interests of persons with constitutional status. The fundamental right to personal and procreative autonomy and, in the broader sense, to individual privacy, prohibits the government from dictating, approving or condemning values, beliefs and matters ultimately involving individual conscience, where opinions about the nature of such values and beliefs are seriously divided; where, at their core, such values and beliefs reflect essentially religious convictions that are fundamental to moral personality; and where the government's decision has a greatly disparate impact on the persons whose individual beliefs and personal commitments are displaced by the State's legislated values. *See* Dworkin, *Life's Dominion,* at 157; Dworkin, *Freedom,* at 101-102.

¶69.That is not to say that matters involving religious values and individual conscience are not appropriately addressed by churches, other organizations and individuals in both sectarian and secular forums. Indeed, such expression aimed at changing individual values and convictions and at fostering respect for the intrinsic value of all life is protected by the First Amendment and, independently of the federal constitution, by Article II, Sections 5 and 7 of the Montana Constitution. However the doctrine of separation of church and state which is also embodied in the First Amendment and, independently, in Article II, Section 5, makes theology an impermissible basis on which to make law or interpret the Constitution. Religious arguments do not count as legal arguments. *See* Dworkin, *Life's Dominion,* at 110.

¶70.For this reason, and without abandoning their own personal beliefs and convictions, those in government who make, execute and interpret the law and who are sworn to support, protect and defend the Constitution may not, except in violation of their oaths of office, succumb to the pressure of those who would engraft the sectarian tenets and personal values of some onto the laws which govern all.

B.

¶71.Our second observation concerns the manner in which the matters discussed in this opinion arise under Montana's Constitution. In keeping with the way in which the issues were argued to and decided by the trial court, we have directed our focus in this opinion to the right of individual privacy found at Article II, Section 10. It bears noting, however, that Montana's Constitution, and especially the Declaration of Rights, is not simply a cook book of disconnected and discrete rules written with

the vitality of an automobile insurance policy. Rather, our Constitution, and in particular its Declaration of Rights, encompasses a cohesive set of principles, carefully drafted and committed to an abstract ideal of just government. It is a compact of overlapping and redundant rights and guarantees. *See* Dworkin, *Freedom,* at 110; Dworkin, *Life's Dominion*, at 166. Thus, the rights of personal and procreative autonomy at issue here also find protection in more than just Article II, Section 10. Without attempting to exhaustively plumb the depths of the Constitution in this regard, several provisions of the Declaration of Rights deserve mention.

¶72 Respect for the dignity of each individual--a fundamental right, protected by Article II, Section 4 of the Montana Constitution--demands that people have for themselves the moral right and moral responsibility to confront the most fundamental questions about the meaning and value of their own lives and the intrinsic value of life in general, answering to their own consciences and convictions. Equal protection, also protected by Article II, Section 4, requires that people have an equal right to form and to follow their own values in profoundly spiritual matters. *See* Dworkin, *Life's Dominion*, at 165-67. Article II, Section 3, guarantees each person the inalienable right to seek safety, health and happiness in all lawful ways--i. e., in the context of this case, the right to seek and obtain medical care from a chosen health care provider and to make personal judgments affecting one's own health and bodily integrity without government interference. As already noted, Article II, Sections 5 and 7, protect, respectively, the freedom to accept or reject any religious doctrine, including those about abortion, and the right to express one's opinion in all lawful ways and forums. The right to due process of law, Article II, Section 17, protects those rights--including rights of personal and procreative autonomy-- inherent in the historical concept of "ordered liberty." Finally, the right of individual privacy guaranteed by Article II, Section 10, requires the government to leave us alone in all these most personal and private matters.

¶73.Having made this observation, though, we must also note that each person's enjoyment of these various constitutional rights is not without a corresponding cost. In fact, Article II, Section 3, requires that those enjoying the inalienable rights set forth in that section "recognize corresponding responsibilities." Whatever may be this cost or corresponding responsibility, however, it does not include the demonization of women who choose to terminate their pregnancies at a time the law allows nor does it mandate the criminalization of providers of abortion services to these women. Likewise, this cost does not require the denigration and condemnation

of those who, as a matter of their own good consciences, either favor or reject abortion. Most importantly, this cost does not permit the government's infringement of personal and procreative autonomy in the name of political ideology.

¶74.Rather, the price--the corresponding responsibility--for our commitment to the values and ideals of just government and for our enjoyment of our individual rights protected by Montana's Constitution is simply tolerance. And indeed, that is a token sum for, among other freedoms, the right to be let alone.

## Summary

¶75.We hold that the core constitutional right infringed by the legislation at issue in the case at bar is the fundamental right of individual privacy guaranteed to every person under Article II, Section 10 of the Montana Constitution. We hold that the personal autonomy component of this right broadly guarantees each individual the right to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from the interference of the government, except in very limited circumstances not at issue here. More narrowly, we hold that Article II, Section 10, protects a woman's right of procreative autonomy--here, the right to seek and to obtain a specific lawful medical procedure, a pre-viability abortion, from a health care provider of her choice. We also hold that the government has failed to demonstrate a compelling state interest for infringing upon these rights of privacy and that, therefore, the amendments to § 37-20-103, MCA, and § 50-20-109, MCA, enacted pursuant to Ch. 321, L. 1995, prohibiting a physician assistant-certified from performing a pre-viability abortion under the supervision of a licensed physician are unconstitutional under Article II, Section 10, of the Montana Constitution.

¶76.The judgment of the District Court is affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ TERRY N. TRIEWEILER

/S/ W. WILLIAM LEAPHART

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

Justice Karla M. Gray, specially concurring.

¶77.I concur in the Court's opinion to the extent it addresses the issue before us in this case. That is, I agree that the challenged statutory amendments are unconstitutional because they violate a woman's right of procreative autonomy protected by Article II, Section 10 of the Montana Constitution and the State has not demonstrated a compelling state interest for infringing on that right. I cannot join in other parts of the Court's opinion which, although scholarly written, are overly broad and far outside the scope of the issue actually before us. In concluding that Article II, Section 10 broadly guarantees each individual the right to make medical judgments affecting his or her bodily integrity and health in partnership with a chosen health care provider free from government interference, the Court's opinion sweeps so broadly as to encompass and decide such issues as the right to physician-assisted suicide and other important health and medical-related issues which simply were not litigated in this case. I cannot agree that it is appropriate to address such matters in this case and, indeed, it is my view that much of the Court's opinion is *dicta*.

¶78.I am particularly troubled by that portion of the Court's opinion which states--without any analysis whatsoever--that the rights of personal and procreative autonomy at issue in this case also find protection in the individual dignity and equal protection rights set forth in Article II, Section 4; the inalienable right to seek safety, health and happiness in all lawful ways contained in Article II, Section 3; the religious and speech freedoms set forth in Article II, Sections 5 and 7; and the due process right contained in Article II, Section 17. That discussion is far beyond the scope of this case as presented and, in any event, is totally unsupported by the Court. While such thoughts appropriately might be included in a concurring opinion if supported by legal analysis, it is my view that they have no place in an opinion addressing and resolving the issue before us under the right to privacy contained in Article II, Section 10 of the Montana Constitution.

¶79.Finally, it is necessary to comment on those portions of the Court's opinion which discuss the propriety of leaving the determination of standards for medical practice in the hands of the medical community--acting through the medical examining and licensing authorities. I generally agree with the Court's discussion in those regards but I do not agree with any implicit notion therein that the Legislature has no place at all in the equation. It is important to keep in mind that the practice of medicine is a privilege, not a right, in Montana and that it is generally subject to legislative oversight in order to protect the health, safety, and welfare of the people of Montana. *See* § 37-3-101, MCA. Indeed, the Montana Board of Medical Examiners (Board) is an entity created by the Legislature via § 2-15-1841, MCA, and given the powers and duties set forth in § 37-3-203, MCA, for the purpose of ensuring that medical licensees conform to appropriate standards of conduct and exercise the privileges granted to them "in the greatest public interest." Section 37-3-302, MCA.

¶80.In discharging its oversight responsibility in the area of medical care for Montanans, however, the Legislature has expressly provided for the licensing of certified physician assistants who practice under the supervision of physicians pursuant to the terms of "utilization plans" approved by the Board. *See* §§ 37-20-101, 37-20-203, and 37-20-301, MCA. As provided by the Legislature, a certified physician assistant is "a member of a health care team, approved by the board, who provides medical services that may include

> examination, diagnosis, prescription of medications, and treatment, as approved by the board, under the supervision of a physician licensed by the board." Section 37-20-401, MCA. The utilization plan requiring Board approval must set forth the scope of the physician assistant's practice, and can be approved only if the physician assistant's practice is within the scope of the training, knowledge, experience and practice of the supervisory physician and also within the scope of the training, knowledge, education and experience of the certified physician assistant. Sections 37-20-301(2)(c), (3)(b), and (3)(c), MCA.

¶81.In the context of the present case, I agree with the Court that, once the statutory requirements for licensure of a certified physician assistant and for approval of the utilization plan covering that certified physician assistant have been satisfied, the Legislature cannot indirectly intrude into a utilization plan setting forth the scope of practice for that physician assistant which has been approved by the medical authorities empowered by the Legislature to do just that. Here, the Board had

approved Cahill's utilization plan which permitted her to perform abortions, and it was inappropriate for the Legislature to substitute its judgment for that of the Board it created to oversee such matters involving the practice, training, knowledge, education and experience of medical personnel.

**¶82.** In summary, I join in those portions of the Court's opinion which address and resolve the issue actually before us. I do not join in those portions of the opinion which cast too wide a net and which implicitly suggest that the Legislature has no role at all in matters relating to the health care to be provided to the people of Montana.

/S/ KARLA M. GRAY

Chief Justice J.A. Turnage joins in Justice Gray's foregoing special concurrence.

/S/ J. A. TURNAGE

1. In the context of this opinion, we use the generic term "health care provider" to refer to any physician, physician assistant-certified, nurse, nurse-practitioner or other professional who has been determined by the appropriate medical examining and licensing authority to be competent by reason of education, training or experience, to perform the particular medical procedure or category of procedures at issue or to provide the particular medical service or category of services which the patient seeks from the health care provider.

2. See George J. Annas, Partial-Birth Abortion, Congress, and the Constitution, 339 The New England Journal of Medicine 279 (1998).

3. See, for example, the federal cases of Weeks v. United States (1914), 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed 652; Olmstead v. United States (1928), 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (Brandeis, J., dissenting); Wolf v. Colorado (1949), 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, overruled on other grounds by Mapp v. Ohio (1961), 367 U.S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081; Mapp, 367 U.S. at 650, 81 S.Ct. at 1689; Griswold, 381 U.S. 479, 85 S.Ct. 1678; Katz v. United States (1967), 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576; and, in Montana, Samlin v. District Court (1921), 59 Mont. 600, 198 P. 362; State ex rel. King v. District Court (1924), 70 Mont. 191, 224 P. 862; Welsh v. Roehm (1952), 125 Mont. 517, 241 P.2d 816; State v. Dess (1969), 154 Mont. 231, 462 P.2d 186; State v. Brecht (1971), 157 Mont. 264, 485 P.2d 47, overruled on other grounds by State v. Long

(1985), 216 Mont. 65, 700 P.2d 153.

4. In his remarks to the Constitutional Convention, Delegate Campbell referred to this constitutional wall of separation as being "absolute". Notwithstanding, neither the United States Supreme Court nor this Court have interpreted constitutional church/state separation as being absolute. Both Courts have recognized that some governmental impacts on religious freedoms is constitutionally permitted. See St. John's Lutheran Church v. State Comp. Ins. Fund (1992), 252 Mont. 516, 523-24, 830 P.2d 1271, 1276-77 (citing Cantwell v. State of Connecticut (1940), 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, and United States v. Lee (1982), 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127).

5. A term added on the floor of the Convention. Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, pp. 1680-81.

6. We have not, heretofore, specifically defined what makes a state interest "compelling," rather, leaving that determination to be made case by case. Nonetheless, we agree with the United States Supreme Court's test in the First Amendment free exercise cases, that to demonstrate that its interest justifying infringement of a fundamental constitutional right is "compelling" the state must show, at a minimum, some interest "of the highest order and . . . not otherwise served," see Wisconsin v. Yoder (1972), 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15, or "the gravest abuse[], endangering [a] paramount [government] interest[]," Thomas v. Collins (1945), 323 U.S. 516, 530, 65 S.Ct. 315, 323, 89 L.Ed. 430. See also Miller v. Catholic Diocese of Great Falls (1986), 224 Mont. 113, 116-17, 728 P.2d 794, 796 (citing Yoder). Some inkling of the Constitutional Convention's view of how serious a situation must exist before the government has a "compelling" interest for infringing the right of individual privacy can be gleaned from delegate comment on electronic surveillance. There, Delegate Dahood noted that, if it should ever be allowed at all, "electronic surveillance shall be justified only in matters involving national security, perhaps in matters involving certain heinous federal crimes where the situation is such that in those instances we must risk the right of individual privacy because there is a greater purpose to be served." Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1687.

7. Delegate Campbell also referred to the 1890 law review article on privacy authored by Samuel Warren and Louis Brandeis (The Right to Privacy, 4 Harv. L. Rev. 193, 195, 205 (1890)), which asserted that the right of privacy encompasses "[t]houghts, emotions, and sensations" and the principle "of an inviolate personality"--concepts which deeply

influenced the later development of American privacy jurisprudence. See Montana Constitutional Convention, Verbatim Transcript, March 9, 1972, p. 1851; Elison, at 2-5.

8. Andrews collects the cases from various federal and state jurisdictions which have directly addressed the question of whether the right of privacy encompasses the decision to obtain or reject medical treatment. The "clear trend of modern authority," answers this question in the affirmative. Andrews, 498 F.Supp. at 1048-51. Since Andrews was handed down other jurisdictions have embraced this view. See American Academy of Pediatrics v. Lungren (Cal. 1997), 940 P.2d 797 (statute requiring pregnant minors to secure parental consent or judicial authorization before obtaining an abortion violated minor's privacy right); Singletary v. Costello (Fla. Dist. Ct. App. 1996), 665 So.2d 1099 (prison inmate on hunger strike had privacy right to refuse medical intervention);Women of the State of Minnesota v. Gomez (Minn. 1995), 542 N.W.2d 17 (statutes that permitted use of public funds for childbirth-related medical services, but prohibited similar use of public funds for medical services related to therapeutic abortions, impermissibly infringed on woman's right of privacy); In re Daniel Joseph Fiori (Pa. Super. Ct. 1995), 652 A.2d 1350 (privacy right guarantees the right to make important personal decisions including termination of life-sustaining treatment); Louisiana v. Perry (La. 1992), 610 So.2d 746 (state may not violate incompetent death row prisoner's privacy right by medicating prisoner against his will with antipsychotic drugs in order to carry out death sentence while prisoner is under the influence of such drugs); Norwood Hospital v. Munoz (Mass. 1991), 564 N.E.2d 1017 (patient had privacy right to refuse blood transfusion); In re the Guardianship of Estelle M. Browning (Fla. 1990), 568 So.2d 4 (surrogate or proxy may exercise privacy right for incompetent patient and terminate patient's artificial life support as long as patient, while competent, had expressed wish to do so); In re T.W. (Fla. 1990), 551 So.2d 1186 (privacy right to terminate pregnancy extends to minors); McConnell v. Beverly Enterprises-Conn., Inc. (Conn. 1989), 553 A.2d 596 (family of terminally ill patient could exercise patient's privacy right to removal of artificial nutrition and hydration); Gray v. Romeo (D. R.I. 1988), 697 F.Supp. 580 (patient's privacy right encompasses the right to refuse life-sustaining medical treatment); Ragsdale v. Turnock (7th Cir. 1988), 841 F.2d 1358 (statutes requiring physicians to perform "elective abortions" only in designated facilities impacted woman's privacy right to an abortion); United States v. Charters (4th Cir. 1987), 829 F.2d 479 (medically competent defendant has privacy right to refuse antipsychotic medication); Rasmussen v. Fleming (Ariz. 1987), 741 P.2d 674 (public fiduciary as guardian of nursing home patient in chronic vegetative state had authority to exercise patient's privacy right to refuse medical treatment with regard to "do not resuscitate" and "do not hospitalize" notations placed on patient's medical chart); Foody v. Manchester

Memorial Hospital (Conn. Super. Ct. 1984), 482 A.2d 713 (family of semicomatose patient could exercise patient's privacy right to discontinue use of all artificial devises intended to continue patient's respiration and pulse); In the Matter of the Welfare of Bertha Colyer (Wash. 1983), 660 P.2d 738 ("an adult who is incurably and terminally ill has a constitutional right of privacy that encompasses the right to refuse treatment that serves only to prolong the dying process"); Severns v. Wilmington Medical Center, Inc. (Del. Ch. 1980), 425 A.2d 156 (guardian of comatose patient may assert patient's privacy right to discontinue life support).

9. Judge Sherlock noted that P.A. Cahill can still perform deliveries of babies in her status as a physician assistant and that these deliveries have the same or greater risk than the sorts of abortion procedures she provided. Specifically, these abortions are classified as Risk Level 2 by the State Board of Medical Examiners while the higher Risk Level 3 is associated with child birth.

10. As noted by the District Court, this conclusion is supported by a Vermont study concluding that the rate of complications between abortions conducted by physicians and those conducted by physician assistants is no different. Freedman, Jillson, Coffin and Novick, Comparison of Complication Rates in First Trimester Abortions Performed by Physician Assistants and Physicians, 76 American Journal of Public Health 550 (1986).

11. The insidious effect of the amendments to the statutes is even more apparent when one recognizes that they severely limit a woman's choice to obtain an intimate, female-specific medical procedure from a health care provider of her own gender. One can imagine the wailing and gnashing of male teeth if a legislature dominated by women, in the "interest of men's health," enacted a law which effectively guaranteed that vasectomies and prostate examinations would only be performed by female physicians.