No. 04-857

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 284

MONTANA SUPREME COURT
COMMISSION ON THE
UNAUTHORIZED PRACTICE OF LAW,

        Petitioner and Respondent,

    v.

JERRY O'NEIL, on Behalf of Himself,
His Clients, and His Constituents,

        Respondent and Appellant,

    v.

THE MONTANA STATE BAR ASSOCIATION,

        Defendant and Respondent.

APPEAL FROM:    The District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DV 02-378B,
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Jerry O'Neil (pro se), Columbia Falls, Montana

    For Respondent Montana Supreme Court Commission on the
    Unauthorized Practice of Law:

        David A. Hawkins, Attorney at Law, Helena, Montana

    For Respondent Montana State Bar Association:

        Stephen C. Berg, Johnson, Berg, McEvoy & Bostock, Kalispell, Montana

        Betsy Brandborg, Attorney at Law, Helena, Montana

For Amicus Curiae:

The Honorable Mike McGrath, Montana Attorney General,
Anthony Johnstone, Assistant Attorney General, Helena, Montana

_____

Submitted on Briefs:  April 5, 2006

Decided:  November 8, 2006

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     The Montana Supreme Court Commission on the Unauthorized Practice of Law (the Commission) filed a Petition for Finding Civil Contempt and for Permanent Injunction against Jerry O'Neil (O'Neil). O'Neil filed a counterclaim against the Commission along with a third-party complaint against the State Bar of Montana (the Bar)[1] alleging defamation, tortious interference with contract and violation of his, his customers' and his constituents' rights to privacy. Prior to trial, the District Court for the Eleventh Judicial District, Flathead County, granted the Bar's Motion for Summary Judgment on O'Neil's third-party complaint against the Bar. The court also granted the Commission's Motion for Summary Judgment on O'Neil's counterclaim against the Commission, but denied the Commission's Motion for Summary Judgment on the issue of whether O'Neil engaged in the unauthorized practice of law. Following a bench trial, the court entered its Judgment and Permanent Injunction finding O'Neil in contempt and enjoining him from practicing law.

¶2     O'Neil appeals the District Court's judgment as well as the court's grants of summary judgment to the Commission and to the Bar. O'Neil also challenges the constitutionality of §§ 37-61-201 and -210, MCA. We affirm.

¶3     We address the following issues on appeal:

¶4     1. Whether O'Neil's third-party complaint against the Bar was timely filed.

---

[1]  O'Neil erroneously denominated his action against the Bar as a counterclaim. However, since the Bar was not a party to the original action, O'Neil's claim against the Bar was actually a third-party complaint and will be referred to as such throughout this Opinion.

3

¶5    2.   Whether the District Court erred in granting the Bar's and the Commission's Motions for Summary Judgment.

¶6    3.   Whether the District Court abused its discretion in denying O'Neil a jury trial.

¶7    4.   Whether §§ 37-61-201 and -210, MCA, are constitutional as applied by the District Court.

¶8    5.   Whether the District Court erred in finding that O'Neil engaged in the unauthorized practice of law.

### Factual and Procedural Background

¶9    O'Neil is not, and never has been, licensed to practice law in the State of Montana. He has not attended law school; he has not sat for the Montana bar examination; and he has not met the Montana Supreme Court's character and fitness requirements. O'Neil is not licensed to practice law in any state of the United States. O'Neil served as a Montana State Senator in the 2001, 2003 and 2005 legislative sessions.

¶10   O'Neil advertised in the Greater Flathead Valley CenturyTel telephone book as an "independent paralegal" under the "Attorney" heading in the yellow pages. The advertisement included the statements that he is "Licensed to Practice Law in Blackfeet Tribal Court" and that he is a "MEMBER: Child & Family Section of the Montana State Bar."

¶11   On February 13, 2001, Eleventh Judicial District Court Judges Ted Lympus, Katherine Curtis and Stewart Stadler wrote the Commission to complain that O'Neil may

4

be engaged in the unauthorized practice of law. The Judges asked the Commission to investigate O'Neil's actions.

¶12 The Commission had received other information prior to this time to the effect that O'Neil's actions may constitute the unauthorized practice of law. In June 1998, Judge Lympus wrote to then Montana Supreme Court Chief Justice J. A. Turnage concerning O'Neil's efforts to represent one of the parties in a dissolution proceeding before the District Court. In February and March 2000, a social worker with Adult Protective Services complained to the Commission that O'Neil was attempting to offer legal advice to an incapacitated individual for whom the social worker was acting as a guardian. O'Neil was purportedly acting on behalf of the incapacitated individual's ex-wife, against whom a restraining order had been issued. In January 2001, a member of the Commission received a transcript sent at the request of Sixteenth Judicial District Court Judge Joe Hegel. The transcript reflected that O'Neil assisted one of the parties in a dissolution proceeding by preparing dissolution materials.

¶13 On May 16, 2001, Commission Chair John Connor wrote O'Neil asking for a detailed description of the services O'Neil provided and the duties that he performed on behalf of his customers. In his letter, Connor warned O'Neil that if he was engaged in the unauthorized practice of law, he may be subject to civil complaint and criminal prosecution. O'Neil's reply acknowledged Connor's request for information, but failed to actually provide the requested information. Connor sent a second letter to O'Neil on September 28, 2001, informing him that the Commission would be conducting an

investigation to determine whether O'Neil was engaged in the unauthorized practice of law. In his October 9, 2001 reply, O'Neil engaged in a tirade against the Commission stating, "If your object is to try me without a jury, you had better bring along your chains and restraints."

¶14 On April 25, 2002, Connor again wrote O'Neil explaining that, based upon its investigation to date, the Commission had determined that there was probable cause to believe that O'Neil was engaged in the unauthorized practice of law. In his letter, Connor directed O'Neil to cease and desist from all such activities. Connor further stated that if the Commission did not receive a written assurance of compliance from O'Neil, it would pursue appropriate legal action against him.

¶15 Because O'Neil failed to provide the written assurance requested, the Commission filed its Petition for Finding of Civil Contempt and for Permanent Injunction on July 15, 2002. The Prayer for Relief requested that O'Neil be found in civil contempt for engaging in the unauthorized practice of law and that the District Court issue a permanent injunction prohibiting O'Neil from engaging in such conduct.

¶16 On November 19, 2002, O'Neil filed a counterclaim against the Commission and a third-party complaint against the Bar, alleging defamation, tortious interference with contract and violation of his, his customers' and his constituents' rights to privacy. O'Neil also demanded a jury trial. O'Neil's actions against the Bar and the Commission were based on the following facts.

¶17 On November 15, 2000, Bar general counsel Betsy Brandborg received a telephone call from Julia Thomason at U.S. West Dex asking if O'Neil was a licensed attorney and, if not, why he was listed under the "Attorney" heading in the Yellow Pages. Brandborg explained that O'Neil was not a licensed attorney with the Bar. Thomason requested a letter confirming that information and suggested that Brandborg also request that O'Neil's name be removed from the "Attorney" section of the Yellow Pages. Brandborg wrote the following letter and sent a copy to O'Neil:

> I have noticed that Jerry O'Neil's "Independent Paralegal" advertisement is included under the attorney listing in the yellow pages. Jerry O'Neil is not an attorney. In spite of his representation to the contrary, Jerry O'Neil is not a member of the State Bar of Montana. I request that you remove Jerry O'Neil's listing from the attorney section of the yellow pages.

¶18 On November 23, 2000, O'Neil wrote a letter in reply claiming that he was an attorney duly licensed by the Blackfeet Tribal Court and the Confederated Salish and Kootenai Tribal Court (CS&K Tribal Court). Upon receiving this information, Brandborg called the CS&K Tribal Court and learned that while O'Neil was licensed as an attorney in that court, they had based that licensure upon O'Neil's representation that he was licensed as an attorney in the Blackfeet Tribal Court. Brandborg next called the Blackfeet Tribal Court and learned that O'Neil was a licensed lay advocate with that court, not an attorney. Thereafter, Brandborg called the CS&K Tribal Court and conveyed the information she had obtained from the Blackfeet Tribal Court that O'Neil was not a licensed attorney with that court. The CS&K Tribal Court subsequently terminated O'Neil's license to practice before that court.

¶19 Brandborg wrote a second letter to Thomason at U.S. West Dex, dated December 5, 2000, to clarify the Bar's position. This letter read in pertinent part:

> As I indicated earlier, Jerry O'Neil is not an attorney, i.e., he has not given the State Bar of Montana any information indicating that he has graduated from an ABA accredited law school, taken Montana's bar examination, or been admitted to the State Bar of Montana as a member of the State Bar of Montana. Mr. O'Neil is an associate member of the Family Law Section of the State Bar of Montana. In accord with Article 1, Section 3 of our by-laws, the fact of Mr. O'Neil's associate membership with the Family Law Section does not mean Mr. O'Neil can claim membership in the State Bar of Montana.
>
> As to Mr. O'Neil's status with the Tribal Courts, it is appropriate for your business to check with them. . . .

Brandborg did not convey this letter or the November 15, 2000 letter to the Tribes nor did she write to either Tribe confirming the information in the telephone calls.

¶20 On September 10, 2004, the Bar filed its Motion for Summary Judgment arguing that it was entitled to judgment as a matter of law because none of O'Neil's three claims for relief against the Bar satisfied the necessary elements of the law to state a claim. On September 14, 2004, the Commission filed its Motion for Summary Judgment also arguing that it was entitled to judgment as a matter of law because none of O'Neil's claims against the Commission satisfied the necessary elements of the law to state a claim. In addition, the Commission asserted that it was also entitled to judgment as a matter of law on its Petition for Finding of Civil Contempt and for Permanent Injunction against O'Neil.

¶21 The District Court subsequently dismissed O'Neil's third-party complaint against the Bar as untimely filed. In its November 16, 2004 Order granting the Bar's Motion for

Summary Judgment, the District Court concluded that the third-party complaint was filed more than 30 days after the Commission filed its petition and that O'Neil had not obtained leave from the court or the parties to file the third-party complaint after the 30 days in violation of M. R. Civ. P. 14(a). The court also ruled that O'Neil's claim of defamation against the Bar failed as a matter of law under § 27-2-204(3), MCA, because it was filed more than two years after the event triggering the claim, namely, the November 15, 2000 letter from Brandborg to U.S. West Dex. Moreover, the court ruled that the Bar was entitled to judgment as a matter of law because none of O'Neil's claims against the Bar satisfied the necessary elements of the law to state a claim.

¶22 On November 24, 2004, the District Court denied the Commission's Motion for Summary Judgment on its Petition for Finding of Civil Contempt and for Permanent Injunction against O'Neil and granted the Commission's Motion for Summary Judgment as to O'Neil's counterclaim against the Commission. The court ruled that there remained genuine issues as to the material facts regarding O'Neil's practice of law as alleged in the Commission's petition, thus summary judgment on that issue was not appropriate. The court dismissed O'Neil's counterclaims against the Commission with prejudice because the Commission is immune from suit under Montana Commission on the Unauthorized Practice of Law (M.C.U.P.L.) Rule 10, and because none of O'Neil's claims against the Commission satisfied the necessary elements of the law to state a claim.

¶23 Following a two-day trial, the District Court entered its Judgment and Permanent Injunction finding O'Neil in contempt for engaging in the practice of law when he is not

9

authorized to do so and permanently enjoining him from engaging in the practice of law "until such time as he becomes duly authorized."

¶24 O'Neil appeals the Judgment and Permanent Injunction along with the District Court's grants of summary judgment to the Bar and to the Commission. The Bar and the Commission jointly filed a response brief on appeal.

## Standard of Review

¶25 We review a district court's decision to grant summary judgment de novo. *Watson v. Dundas*, 2006 MT 104, ¶ 16, 332 Mont. 164, ¶ 16, 136 P.3d 973, ¶ 16 (citing *Farmers Union Mut. Ins. Co. v. Staples*, 2004 MT 108, ¶ 18, 321 Mont. 99, ¶ 18, 90 P.3d 381, ¶ 18). In doing so, we apply the criteria contained in M. R. Civ. P. 56(c), which provides that the moving party must establish both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Watson*, ¶ 16 (citing *Grimsrud v. Hagel*, 2005 MT 194, ¶ 14, 328 Mont. 142, ¶ 14, 119 P.3d 47, ¶ 14). The burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue of material fact does exist. *Watson*, ¶ 16.

¶26 In addition, we review a district court's findings of fact to determine if they are clearly erroneous. *Watson*, ¶ 17 (citing *Ramsey v. Yellowstone Neurosurgical Assocs.*, 2005 MT 317, ¶ 13, 329 Mont. 489, ¶ 13, 125 P.3d 1091, ¶ 13). To make that determination, we use the following three-part test: (1) whether the findings are supported by substantial evidence; (2) whether the trial court has misapprehended the effect of the evidence; and (3) whether a review of the record leaves this Court with the

10

definite and firm conviction that a mistake has been committed. *Watson*, ¶ 17. We review a district court's conclusions of law for correctness. *Watson*, ¶ 17 (citing *Galassi v. Lincoln County Bd. of Com'rs*, 2003 MT 319, ¶ 7, 318 Mont. 288, ¶ 7, 80 P.3d 84, ¶ 7).

**Issue 1.**

¶27 *Whether O'Neil's third-party complaint against the Bar was timely filed.*

¶28 The Commission filed its Petition for Finding of Civil Contempt and for Permanent Injunction on July 15, 2002. O'Neil filed his Answer to Petition and Demand for Jury Trial on August 2, 2002. O'Neil did not file his counterclaim against the Commission and his third-party complaint against the Bar until November 19, 2002.

¶29 In its Findings of Fact, Conclusions of Law, and Order Regarding State Bar of Montana's Motion for Summary Judgment, the District Court ruled that O'Neil's third-party complaint was untimely under M. R. Civ. P. 14(a), which requires leave of all parties to the action for the filing of a third-party complaint if the third-party complaint is not filed within 30 days after serving the original answer. Here, O'Neil's third-party complaint was filed more than 30 days after he filed his answer. Nevertheless, O'Neil's third-party complaint would be considered timely if the parties to the action agreed to the late filing. *See* M. R. Civ. P. 14(a).

¶30 O'Neil contends that for all practical purposes the Commission is identical in interest and standing in this case to the Bar, thus his third-party complaint against the Bar was timely filed along with his counterclaim against the Commission. Moreover, he asserts that his counterclaim against the Commission and his third-party complaint

11

against the Bar were incorporated in his original answer filed on August 2, 2002, wherein he stated:

> Respondent respectfully prays the Court for the following relief:
> . . . .
> 2. For all the relief requested in the Cross-claim to be filed in this cause to be incorporated by such filing in this Response by reference . . . .

¶31 Contrary to O'Neil's assertions, the Commission and the Bar are not the same entity. The Bar is a membership organization unified by the Montana Supreme Court

> to aid the courts in maintaining and improving the administration of justice; to foster and maintain on the part of those engaged in the practice of law high standards of integrity, learning, competence, public service, and conduct; to safeguard proper professional interests of members of the bar . . . and to insure that the responsibilities of the legal profession to the public are more effectively discharged.

Supreme Court Order Unifying the State Bar, No. 12616 (1974). The Commission, on the other hand, is a nine-member investigative committee composed of practicing lawyers and non-lawyers appointed by this Court and charged with the duty to protect the public interest by investigating complaints of unauthorized practice of law. M.C.U.P.L. Rules 1(a), 1(c) and 3(a).

¶32 Consequently, O'Neil's contention that he did not need to meet the 30-day requirement in M. R. Civ. P. 14(a) for third-party complaints because the Bar and the Commission are the same entity is without merit.

¶33 O'Neil also contends that he had the District Court's express permission for the late filing rendered orally from the bench and that the Commission and the Bar agreed

12

not to pursue any Rule 14 claims and to allow O'Neil to file the third-party complaint against the Bar.

¶34 The transcript of the October 28, 2004 pretrial conference and hearing on the Motions for Summary Judgment indicates that the following colloquy occurred:

> MR. O'NEIL: . . . I don't believe we need to have a special rule from the Court to serve that [third-party complaint]. But if we do I would request the Court to give us one retroactive in order to conserve the resources of the Court so we don't have to go back and litigate it over again.
> As far as the –
> THE COURT: If that's an issue before the Court, then, Mr. Berg, Mr. Hawkins, do you wish to take a position on that?
> MR. BERG [Counsel for the Bar]: Judge, for the State Bar it is an issue. It is purely procedural. We are way down the line for it. We are approaching trial. We don't want to make it a substantive issue. We don't want this case to ride on that and find ourselves here in six months.
> THE COURT: So you object to the filing –
> MR. BERG: I will not object to what he is basically asking of us, which is that we waive the –
> THE COURT: 30 days.
> MR. BERG: Yes.
> THE COURT: All right. And then, Mr. Hawkins?
> MR. HAWKINS [Counsel for the Commission]: I'd agree.
> THE COURT: And, sir, based on the lack of objection from the other two parties, then I will allow you to file the document that you wish to file.

¶35 Based on the foregoing, it appears that the District Court and the parties agreed to allow O'Neil to file his third-party complaint against the Bar even though it was not filed within the time prescribed by M. R. Civ. P. 14(a).

¶36 Accordingly, we hold that the District Court erred in dismissing O'Neil's third-party complaint in part because it was untimely. Although we have determined that the District Court erred on this issue, it is not necessary to remand for further proceedings

13

since the District Court also entered findings of fact and conclusions of law on the merits of O'Neil's third-party complaint against the Bar sufficient for this Court to consider on appeal and we affirm on those issues.

**Issue 2.**

¶37   *Whether the District Court erred in granting the Bar's and the Commission's Motions for Summary Judgment.*

¶38   O'Neil asserted three claims for relief against the Bar and the Commission: defamation, tortious interference with contract and privacy.  The defamation claim is based on the letters written by Brandborg to U.S. West Dex.  The tortious interference claim involves those same letters and alleges that the Bar and the Commission wrongfully interfered with O'Neil's contracts with U.S. West Dex and with the tribal courts and injured his ability to earn an income.  As to the privacy claim, O'Neil alleges that the conduct of the Bar and the Commission violated his, his customers' and his constituents' rights to individual privacy "by interfering with their discussion and disclosure of matters involving the preparation and strategy of their personal and legal matters with whom they choose."

¶39   First, we agree with the District Court that the claims against the Commission are barred as the Commission has immunity from litigation when exercising its functions.  To that end, M.C.U.P.L. Rule 10 provides:

> In exercising its functions and powers, the commission, its members, employees and all personnel through whom the commission functions shall enjoy such judicial immunities as the Montana Supreme Court would enjoy if performing the same functions.

14

¶40 The judicial immunities enjoyed by the Montana Supreme Court (and, pursuant to M.C.U.P.L. Rule 10, by the Commission) are set forth in § 2-9-112, MCA,[2] which provides:

> (1) The state and other governmental units are immune from suit for acts or omissions of the judiciary.
> (2) A member, officer, or agent of the judiciary is immune from suit for damages arising from his lawful discharge of an official duty associated with judicial actions of the court.
> (3) The judiciary includes those courts established in accordance with Article VII of the Constitution of the State of Montana.

¶41 Second, O'Neil provides no evidence to suggest that the Commission was involved in writing the letters to U.S. West Dex or in representing to the CS&K Tribal Court that O'Neil was not an attorney. Consequently, O'Neil's claims against the Commission for defamation and for tortious interference fail as a matter of law.

¶42 Third, O'Neil's claims against the Bar for defamation and for tortious interference and against both the Bar and the Commission for invasion of privacy also fail as a matter of law. The reasons for this determination are set forth below.

*Defamation*

¶43 In its November 16, 2004 Order granting the Bar's Motion for Summary Judgment, the District Court determined that O'Neil's claim of defamation against the Bar failed as a matter of law because it was filed more than two years after the event triggering the claim, namely, Brandborg's November 15, 2000 letter to U.S. West Dex. The District Court correctly cited § 27-2-204(3), MCA, which provides that "[t]he period

---

[2] O'Neil raised no challenge to this statute.

15

prescribed for the commencement of an action for libel, slander, assault, battery, false imprisonment, or seduction is within 2 years." Here, O'Neil did not file his third-party complaint against the Bar until November 19, 2002, two years and four days after the November 15, 2000 letter.

¶44 O'Neil's argument that his third-party complaint against the Bar was timely because it was incorporated in his August 2, 2002 answer to the Commission's petition, is without merit. As we have already stated, the Bar and the Commission are two separate entities. Consequently, the Bar did not become a party to these proceedings until O'Neil filed his third-party complaint on November 19, 2002. M. R. Civ. P. 3 provides that "[a] civil action is commenced by filing a complaint with the court." Hence, the statute of limitations on O'Neil's defamation claim did not toll until the complaint was filed, four days too late. This Court has held that neither ignorance of the law nor the need for time to present a *pro se* case constitutes an adequate excuse to disregard a state of limitations. *Cf. In re Petition of Gray*, 274 Mont. 1, 2, 908 P.2d 1352, 1352 (1995).

¶45 Accordingly, we hold that the District Court did not err in granting summary judgment to the Bar on O'Neil's defamation claim.

*Tortious Interference*

¶46 O'Neil contends that the Bar wrongfully interfered with his contract with "outside jurisdictions and businesses" and injured his ability to earn an income. O'Neil also argues that the District Court failed to consider Brandborg's "false" notification to the CS&K Tribal Court that O'Neil was not licensed to practice law before the Blackfeet

16

Tribal Court and that the CS&K Tribal Court terminated O'Neil's right to practice before them because of Brandborg's representations.

¶47 The Bar contends that in order to assert a prima facie claim of tortious interference, O'Neil must show that it "intentionally committed a wrongful act without justification or excuse." *Richland Nat. Bank & Trust v. Swenson*, 249 Mont. 410, 419, 816 P.2d 1045, 1051 (1991). Hence, the Bar claims that O'Neil must show that the Bar's acts were: (1) intentional and willful; (2) calculated to cause damage to O'Neil in his business; and (3) done with the unlawful purpose of causing damage or loss without justifiable cause on their part. *Pospisil v. First Nat. Bank of Lewistown*, 2001 MT 286, ¶ 13, 307 Mont. 392, ¶ 13, 37 P.3d 704, ¶ 13.

¶48 Here, Brandborg's letters to U.S. West Dex and representations to the CS&K Tribal Court were not "wrongful" acts, nor were they committed "without justification or excuse." Brandborg and the Bar have a responsibility to tell the truth regarding the status of those admitted or not admitted to practice law in this State. Moreover, Brandborg only reported what the Blackfeet Tribal Court told her regarding O'Neil's status with the Tribe, that O'Neil is a lay advocate, not an attorney. As the Bar points out in its brief on appeal, the social interests in protecting the freedom of action of the Bar to tell the truth outweigh O'Neil's claimed right to misrepresent his status as a licensed attorney to the public. As stated in ¶ 31 of this Opinion, the mission of the Bar includes, among other things, the obligation to foster high standards of integrity, learning, competence, public

17

service and conduct on the part of those who are engaged in the practice of law and, concomitantly, to protect the public from those who do not meet their standards.

¶49    Accordingly, we hold that the District Court did not err in granting the Bar's Motion for Summary Judgment on this issue.

*Privacy*

¶50    O'Neil contends that the Bar and the Commission violated his, his customers' and his constituents' rights to privacy as guaranteed by Article II, Section 10, of the Montana Constitution, which provides: "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest."  O'Neil claims that the conduct of the Bar and the Commission "violates his customers' rights to individual privacy by interfering with their discussion and disclosure of matters involving the preparation and strategy of their personal and legal matters with whom they choose."

¶51    The Bar and the Commission assert that O'Neil's claim of protection for his customers and his constituents fails as O'Neil has no standing to assert a violation of another person's right to privacy.  O'Neil claims, on the other hand, that he has the same standing to argue the privacy rights of his customers as the physicians in *Armstrong v. State*, 1999 MT 261, 296 Mont. 361, 989 P.2d 364, had to argue the privacy rights of their patients.  We disagree.

¶52    This Court did hold in *Armstrong* that healthcare providers have standing to assert the individual privacy rights of their women patients to obtain a pre-viability abortion

18

from a healthcare provider of their choosing. We did so because of the closeness of the relationship between the women patients and their healthcare providers. *Armstrong*, ¶¶ 9-13. We stated in *Armstrong* that "[a]side from the woman herself, therefore, the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, that decision." *Armstrong*, ¶ 10.

¶53 Lost in O'Neil's reliance on our decision, however, is a critical distinction between his situation and the healthcare providers in *Armstrong* who we determined to have representational standing to represent the individual privacy and autonomy interests of their patients. *Armstrong, ¶¶* 2-13. In that case, the physician assistants and the physicians were all licensed by the State Board of Medical Examiners to perform the medical procedures and to render the medical services implicated in the statutory scheme that was at issue in that case. *Armstrong*, ¶¶ 1, 63-64. Thus, there was an intimate nexus between the patients' individual privacy and autonomy right to obtain a lawful medical procedure from their chosen, *licensed* healthcare provider. The licensed healthcare providers had as much an interest in protecting autonomy and individual privacy implicit in the provider/patient relationship, as did the patients themselves because the State licensing authority permitted this relationship to exist. *Armstrong*, ¶ 58.

¶54 This Court did not, however, hold in *Armstrong* that a patient has any individual privacy right to obtain medical services from one *not* licensed by the State Board of Medical Examiners to perform the services at issue. *See Armstrong*, ¶¶ 59-62.

19

¶55    The point to be noted is that O'Neil is *not* licensed to practice law.  *See* § 37-61-201, MCA.  He performs paralegal services.  *See* § 37-60-101(12), MCA.  O'Neil cannot enter into an attorney/client relationship, because he is not an attorney.  Whether O'Neil's customers reveal private personal and legal matters to him in his capacity as a paralegal is beside the point.  What is at issue here is O'Neil practicing law when he is not licensed to do so.  His customers have no privacy right in seeking from O'Neil legal services which he is not licensed to perform.  And, O'Neil has no representational standing to assert on behalf of his customers a privacy right that, by law, does not exist.

¶56    The Bar and the Commission also argue that there is no private right of action against a non-governmental entity.  They maintain that the privacy section of the Montana Constitution contemplates privacy invasion by state action only.  On the contrary, we stated in *Armstrong* that

> Article II, Section 10 of the Montana Constitution was intended by the delegates to protect citizens *from illegal private action* and from legislation and governmental practices that interfere with the autonomy of each individual to make decisions in matters generally considered private.

*Armstrong*, ¶ 35 (emphasis added).

¶57    Finally, we also hold that O'Neil's own right to privacy has not been violated in this case.  O'Neil's advertisements in the Yellow Pages imply that he is a member of the Bar.  The Bar's clarification of his lay status in conversations with the Tribes and correspondence with U.S. West Dex does not fall into the category of intruding into O'Neil's "private activities."  No person has a privacy interest to misrepresent himself to

20

the public as a licensed professional when he is not. Indeed, it is O'Neil's activities that he advertises to the public that are in question.

¶58 Accordingly, we hold that the District Court did not err in granting the Bar's and the Commission's Motions for Summary Judgment on this issue.

**Issue 3.**

¶59 *Whether the District Court abused its discretion in denying O'Neil a jury trial.*

¶60 O'Neil maintains that the Commission sought a finding of criminal contempt against him and that he was under a threat of jail time as a result of the injunction. Consequently, he contends that he was entitled to a jury trial and that the District Court deprived him of his right to due process by not granting him one.

¶61 O'Neil further contends that the District Court's Order should be vacated because it violates the mandates of *Huffine v. Montana Sixth Jud. Dist. Court*, 285 Mont. 104, 110, 945 P.2d 927, 931 (1997), in that "[p]rosecution for criminal contempt must be carried out pursuant to the procedures set forth in Title 46, MCA, to ensure that criminal penalties are not imposed on someone who has not been afforded the proper protections."

¶62 O'Neil's contentions are without merit and his reliance on *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002), and *United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310 (1995), regarding an individual's right to a jury trial in a criminal proceeding, is misplaced. The Commission's requested relief was for an injunction and a finding of *civil* contempt against O'Neil for engaging in the unauthorized practice of law, not criminal contempt.

21

¶63    The United States Supreme Court has determined that contempt proceedings are

*sui generis.*

> While contempt may be an offense against the law and subject to appropriate punishment, certain it is that since the foundation of our government proceedings to punish such offenses have been regarded as *sui generis* and not "criminal prosecutions" within the Sixth Amendment or common understanding.

*Myers v. United States*, 264 U.S. 95, 104-05, 44 S.Ct. 272, 273 (1924).   Moreover,

contempt proceedings are within the inherent power of all courts to enforce obedience,

and this ability is something the courts must possess to properly perform their functions.

*Myers*, 264 U.S. at 103, 44 S.Ct. at 273.

¶64    In Montana, M.C.U.P.L. Rule 8(b) authorizes the Commission's request for a

finding of civil contempt:

> (1)  A civil contempt proceeding for unauthorized practice of law, as provided by § 37-61-210, MCA, or other applicable statute or law, shall be prosecuted in the manner provided by § 3-1-501, et seq., MCA.
> (2)  The procedure and punishment for a civil contempt shall be provided by § 3-1-501, et seq., MCA.
> (3)  Nothing set forth herein shall be construed to prohibit or limit the right of the district court to issue a permanent injunction in liew [sic] of or in addition to any punishment imposed for a civil contempt.

¶65    A person before a court charged with contempt is entitled to due process.   The

nature of the due process to be afforded is codified at § 3-1-518, MCA, which provides:

> **Hearing on contempt not committed in immediate view and presence of court or judge at chambers.**  (1) When a person arrested for a contempt not committed in the immediate view and presence of the court or judge at chambers has been brought up or appeared, the court or judge shall proceed to investigate the charge, shall schedule and hold a hearing on any answer that the person arrested may make to the charge, and may examine witnesses for or against the person, for which an adjournment may be had

22

from time to time, if necessary. The judge investigating the charge and scheduling and presiding over the hearing may not be the judge against whom the contempt was allegedly committed, except that if the contempt arose from the violation of an order of the court issued after a hearing on the merits of the subject of the order, the judge who issued the order may punish the contempt or compel compliance with the order unless it is shown that the judge would not be impartial in addressing the contempt.

(2) *The charged person must be given a reasonable opportunity to obtain counsel and prepare a defense or explanation prior to the hearing. The charged person may testify and call witnesses at the hearing.* [Emphasis added.]

¶66 In *Kaufman v. 21st Judicial Dist. Court*, 1998 MT 239, ¶ 33, 291 Mont. 122, ¶ 33, 966 P.2d 715, ¶ 33, we delineated the measure of due process to be afforded in contempt cases:

In cases in which it is not necessary for a court to take instant action, however, a contemnor is entitled to full due process. This includes a hearing before a neutral judge, during which the contemnor is advised of the charges against him or her, has a reasonable opportunity to meet them by way of defense or explanation, has the right to be represented by counsel, has a chance to testify and call other witnesses on his behalf, and, in instances in which criminal punishment is a consequence, a finding of guilt beyond a reasonable doubt.

¶67 Furthermore, even if this were a criminal contempt proceeding, there is no general federal constitutional right to a trial by jury with respect to criminal contempt proceedings in federal or state courts. *Bessette v. W.B. Conkey Co.*, 194 U.S. 324, 336-37, 24 S.Ct. 665, 670 (1904); *Muniz v. Hoffman*, 422 U.S. 454, 95 S.Ct. 2178 (1975); *International Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 114 S.Ct. 2552 (1994). In criminal contempt cases imposing *serious* contempt penalties, there *might be* a right to a jury trial, *see Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444 (1968), however, the term "serious" has not been fully defined. In *Muniz*, a fine of $10,000

23

imposed on a union was insufficient to be considered serious enough to trigger the right to trial by jury. *Muniz*, 422 U.S. at 477, 95 S.Ct. at 2190-91. The Supreme Court also suggested in *International Union* that imprisonment for a period of six months or less was not a serious penalty. *International Union*, 512 U.S. at 826-27, 114 S.Ct. at 2557.

¶68 Section 37-61-210, MCA, provides that if a person practices law in any court (except a justice's court or a city court), without being licensed as an attorney, then that person is guilty of contempt of court. The law does not require any particular penalty be imposed. In addition, § 3-1-511, MCA, provides that contempt committed in the presence of the court allows a penalty of a fine not to exceed $500 or imprisonment for a term not to exceed 30 days, or both. Section 3-1-520, MCA, provides that contempt to compel performance allows a penalty of a fine not to exceed $500 and/or confinement until the contemnor has performed the act. None of these sanctions rise to the level of a "serious" penalty as provided under federal law, and O'Neil advances no argument supporting a different definition of "serious" under State law.

¶69 O'Neil is entitled to due process under § 3-1-518(2), MCA, but the potential penalty in this action did not rise to a level that might require a jury trial. O'Neil was not charged with criminal contempt under § 45-7-309, MCA, and the Commission did not ask for confinement or a fine. Consequently, O'Neil was afforded all the process due him including a reasonable opportunity to obtain counsel and to prepare a defense or explanation prior to the hearing, as well as the opportunity to testify in his own behalf

24

and to call witnesses at the hearing.  On the facts of this case, O'Neil is not entitled to a higher standard of due process which might include a jury trial.

¶70     Accordingly, we hold that the District Court properly ruled that the contempt proceeding against O'Neil could be tried without a jury.

## Issue 4.

¶71     *Whether §§ 37-61-201 and -210, MCA, are constitutional as applied by the District Court.*

¶72     O'Neil contends that the Montana Constitution does not give the Supreme Court any rule-making authority over those outside of a court setting.  On the contrary, in *State v. Merchants' Credit Service*, 104 Mont. 76, 94, 66 P.2d 337, 339 (1937), *overruled on other grounds by Rae v. Cameron*, 112 Mont. 159, 114 P.2d 1060 (1941), this Court stated:

> The first question for determination is whether this court has jurisdiction to punish for contempt, if the acts complained of constitute unlawful practice of law.  This court is by statute given the exclusive power to confer upon any persons the right to practice law and to deprive them of that right.  If any person shall engage in the practice of law without being authorized so to do, *even though that practice is not done directly in this court*, it has the right to punish for contempt.  [Internal citations omitted and emphasis added.]

Furthermore, "[p]ursuant to the provisions of Article VII, Section 2, of the Constitution of the State of Montana, the Montana Supreme Court has inherent jurisdiction to prohibit the unauthorized practice of law."  M.C.U.P.L. Rule 1(b).

¶73     As the Bar and the Commission point out in their brief on appeal, the primary reason for prohibiting the unauthorized practice of law is to protect the public from being

advised and represented by unqualified persons not subject to professional regulation. In a case decided more than 90 years ago, this Court stated:

> When we consider the relationship of attorney and client and its consequences to the client, as well as to his possible adversary, it becomes manifest that insistence upon due authorization of the persons acting as attorneys is of vital importance. . . . The people have a right to presume that the law in this respect is being enforced; if it is not enforced, such persons as intrust their business to an unchallenged pretender are permitted, in matters of life, of liberty and of property, to lean upon a broken reed.

*In re Bailey*, 50 Mont. 365, 369, 146 P. 1101, 1103 (1915). We also recognized in *Bailey* that "it is universally held that the practice of law is not an inherent right but a privilege, *subject entirely to state control.*" *Bailey*, 50 Mont. at 369, 146 P. at 1103 (emphasis added).

¶74 O'Neil also contends that §§ 37-61-201 and -210, MCA, are too overbroad and vague to impose any restrictions on his liberty and are insufficient to support the court's finding of "criminal" contempt and entry of an injunction against him. The Bar and the Commission point out that while O'Neil did not brief the constitutionality of these statutes at the District Court level and the District Court did not address that issue, the constitutionality of these statutes was implicitly raised throughout the trial and in O'Neil's brief on appeal and thus merit this Court's review. We agree.

¶75 In spite of O'Neil's contentions to the contrary, the Legislature (and not the Supreme Court) enacted the statutes on unauthorized practice that O'Neil claims to be unconstitutional. These statues provide:

26

> **Who considered to be practicing law.** Any person who shall hold himself out or advertise as an attorney or counselor at law or who shall appear in any court of record or before a judicial body, referee, commissioner, or other officer appointed to determine any question of law or fact by a court or who shall engage in the business and duties and perform such acts, matters, and things as are usually done or performed by an attorney at law in the practice of his profession for the purposes of parts 1 through 3 of this chapter shall be deemed practicing law.

Section 37-61-201, MCA.

> **Penalty for practicing without license.** If any person practices law in any court, except a justice's court or a city court, without having received a license as attorney and counselor, he is guilty of a contempt of court.

Section 37-61-210, MCA.

¶76 O'Neil incorrectly frames his freedom of speech challenge to these statutes as an overbreadth challenge. However, the overbreadth doctrine enables plaintiffs to challenge a statute, not because their own rights of free expression are violated, "but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916 (1973).

¶77 The overbreadth doctrine

> is an exception to the general rule that statutes are evaluated in light of the situation and facts before the court. A statute which can be applied to constitutionally protected speech and expression may be found to be invalid in its entirety, even if it could validly apply to the situation before the court. However, a statute cannot be challenged just because it might result in an unconstitutional abridgment of speech in a hypothetical case. Rather, the unconstitutional overbreadth must be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.

27

*State v. Allum*, 2005 MT 150, ¶ 29, 327 Mont. 363, ¶ 29, 114 P.3d 233, ¶ 29 (internal citations and quotation marks omitted).

¶78    Here, O'Neil claims that there is a direct constitutional injury to his personal "First Amendment rights of freedom of speech, expression, association, petition and privacy" as a result of a specific application of the unauthorized practice statutes to his conduct. O'Neil fails to show, however, that the impact of the statutes on the conduct of other speakers will differ from its impact on his conduct, hence his case is not susceptible to a facial overbreadth challenge based on hypothetical applications of the law not before this Court. *See Hill v. Colorado*, 530 U.S. 703, 731-32, 120 S.Ct. 2480, 2497-98 (2000). "To the extent that the statute may reach constitutionally protected expression," any potential constitutional infirmities not implicated by O'Neil's case could "be cured through case-by-case analysis of the fact situations where the statute is assertedly being applied unconstitutionally." *State v. Lilburn*, 265 Mont. 258, 270, 875 P.2d 1036, 1044 (1994), *cert. denied*, 513 U.S. 1078, 115 S.Ct. 726 (1995).

¶79    The central question O'Neil's freedom of speech challenge poses is whether the District Court's injunction that O'Neil may not engage in the practice of law, as defined by § 37-61-201, MCA, and further specified by the injunction's terms, unconstitutionally restricts O'Neil from engaging in conduct protected by the First Amendment and Article II, Section 7, of the Montana Constitution. The United States Supreme Court has responded to this question by holding that regulation of the bar "is a subject only marginally affected with First Amendment concerns." *Ohralik v. Ohio State Bar Ass'n,*

436 U.S. 447, 459, 98 S.Ct. 1912, 1920 (1978). Other courts have repeatedly rejected claims "that an individual has a First Amendment right to practice law in any way of his choosing, free even of rationally-based regulation," because such a "broadly formulated First Amendment argument here would, if successful, greatly undermine the power of states to regulate bar membership, when this power has been repeatedly recognized and upheld by the courts." *Russell v. Hug*, 275 F.3d 812, 823 (9th Cir. 2002).

¶80 Just as O'Neil has no First Amendment right to practice law without a license, his customers have no First Amendment right to unlicensed legal representation. The Supreme Court has recognized a First Amendment right to receive legal advice, but that right is limited to clients of duly qualified attorneys consistent with "the State's interest in high standards of legal ethics." *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217, 225, 88 S.Ct. 353, 357 (1967). The unauthorized practice statutes are narrowly tailored to target only the provision of legal services in Montana by individuals who have not proven through examination and admission to the bar that they "are qualified and possess a familiarity with [Montana] law." *Mothershed v. Justices of Supreme Court*, 410 F.3d 602, 611-12 (9th Cir. 2005). There remain ample alternative channels for providing legal services to O'Neil's customers—the thousands of licensed attorneys in Montana.

¶81 O'Neil also contends that the unauthorized practice statutes are unconstitutionally vague because they fail to define what constitutes the practice of law. "A statute is void for vagueness on its face if it fails to give a person of ordinary intelligence fair notice that

29

the statute does not permit his contemplated conduct." *Yurczyk v. Yellowstone County*, 2004 MT 3, ¶ 33, 319 Mont. 169, ¶ 33, 83 P.3d 266, ¶ 34[3] (citing *State v. Martel*, 273 Mont. 143, 150, 902 P.2d 14, 18 (1995)).

¶82   This Court has long defined the practice of law to include legal services whose product touches legal matters not immediately at issue in court:

> A person who makes it his business to act and who does act for and by the warrant of others in legal formalities, negotiations or proceedings, practices law; and when his acts consist in advising clients touching legal matters pending or to be brought before a court of record, or in preparing pleadings or proceedings for use in a court of record, or in appearing before a court of record, either directly or by a partner or proxy, he is practicing law in a court of record.

*Bailey*, 50 Mont. at 367-68, 146 P. at 1002 (internal citations omitted).  Here, §§ 37-61-201 and -210, MCA, provide fair notice of the prohibited conduct.

¶83   Accordingly, we hold that §§ 37-61-201 and -210, MCA, are constitutional as applied by the District Court.

**Issue 5.**

¶84   *Whether the District Court erred in finding that O'Neil engaged in the unauthorized practice of law.*

¶85   O'Neil argues that the injunction is "neither precise nor comprehensible to a reasonable person" and that the phrase "things usually done or performed by an attorney at law in the practice of his profession" is "vague rather than precise, subjective rather

---

[3] The paragraph numbers in the Pacific Reporter differ from the paragraph numbers in the Montana Reports because Pacific Reporter numbered two consecutive paragraphs the same.

than objective, and utterly insufficient to support an injunction, much less the threat of criminal contempt for the violation of that injunction."

¶86 In its written judgment filed January 10, 2005, the District Court listed the following as indicia of the practice of law:

a. The giving of advice or counsel to others as to their legal rights or responsibilities or the legal rights or responsibility of others.
b. Selecting, drafting and completing legal papers, pleadings, agreements and other documents which affect the legal rights or responsibilities of others.
c. Appearing, or attempting to appear, as a legal representative or advocate for others in a court or tribunal of this state.
d. Negotiating the legal rights or responsibilities of others.
e. Holding one's self out or advertising one's self as an attorney admitted to practice law in Montana; or, holding one's self out as a non-attorney entitled to practice law in Montana; or otherwise advertising services in a manner that would reasonably mislead the public to believe that one is an attorney, or otherwise licensed or certified legal advocate in the courts of the State of Montana.

Contrary to O'Neil's contentions, these indicia are precise, comprehensible to a reasonable person and sufficient to prevent a person of common intelligence from having to guess at their meaning.

¶87 O'Neil's conduct of drafting pleadings for his customers, providing them with legal advice and appearing in court with his customers, unquestionably constitutes "practicing law" under § 37-61-201, MCA. And, O'Neil readily admits that he has done so without having received a license to practice law under § 37-61-210, MCA.

¶88 Accordingly, we hold that the District Court did not err in finding that O'Neil engaged in the unauthorized practice of law.

31

¶89 O'Neil also claims that we should give full faith and credit to the acts of the Tribes as we would the acts of any other state or federal government. On that basis, he argues that because he is an attorney licensed to practice in the Blackfeet Tribal Court, we should allow him to practice law in our State courts. First, as already noted in this Opinion, O'Neil is not an attorney with the Blackfeet Tribal Court, he is a lay advocate. Second, absent a statutory requirement to the contrary, the doctrine of full faith and credit does not apply here. The Tribe is a sovereign nation and can license whomever it wants before its courts. There is no requirement that full faith and credit be given to that decision as regards the practice of law in Montana's State courts.

¶90 O'Neil further claims that he should be admitted to practice before Montana's state courts *pro hac vice*. However, Montana's rules on *pro hac vice* admission require admission in "the highest court of another state." Rules for Admission to the Bar of Montana § 4 (2005). O'Neil is not an attorney and he is not from out of state. We do not perfunctorily admit attorneys to practice *pro hac vice* from out of state; there is an entire process they must go through, not the least of which is that they must be admitted to the practice of law in another state by that state's highest court.

¶91 Affirmed.


/S/ JAMES C. NELSON

We concur:

/S/ JIM RICE
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS